MICHAEL PARKER[1] vs. MARIA A. D'AVOLIO & another.[2]

No. 94-P-785.

Essex. September 15, 1995. - May 6, 1996.

Present: PORADA, IRELAND, & GREENBERG, JJ.

*Lead Poisoning. Consumer Protection Act,* Offer of settlement, Damages, Demand letter. *Practice, Civil,* Consumer protection case. *Words,* "Bad faith."

In an action for violation of the lead poisoning prevention law and G. L. c. 93A, § 9, nothing in the record before a judge of the Housing Court supported his finding that the defendant's offer of settlement in response to the plaintiffs' demand letter was made in bad faith so as to warrant an assessment of multiple damages. [395-403]

CIVIL ACTION commenced in the Superior Court Department on May 23, 1989.

Upon transfer to the Northeast Division of the Housing Court Department, a motion for partial summary judgment as to liability was heard by *David D. Kerman,* J., and the issues of causation and damages were tried before him.

*Robert S. Frank, Jr. (Mark D. Cahill & Richard B. Kirby* with him) for the defendants.

*Edmund P. Daley (Daniel J. Johnedis* with him) for the plaintiff.

GREENBERG, J. The plaintiff, a minor child, initially brought claims in the Superior Court for violations of the lead poisoning prevention law (G. L. c. 111, §§ 190-199A [1988 ed.]). Later, a claim under G. L. c. 93A, § 9, was added, and the case was transferred to the Housing Court pursuant to G. L. c. 211B, § 9. Upon a jury verdict, judgment entered in favor of the plaintiff in the amount of

---

[1]By his mother and next friend, Ellen Parker.

[2]Michael P. D'Avolio, individually and as trustee of 61 Vine Street Realty Trust.

$1,250,000. That sum reflected the compensatory damages (without prejudgment interest) assessed against the defendants under G. L. c. 111, § 199.

Having reserved the c. 93A claim for his decision, the judge without objection by counsel held a nonevidentiary hearing at which he heard arguments from counsel concerning the c. 93A claim. Based on the evidence presented at the jury trial and the arguments of counsel, the judge ruled that the defendants' offer to settle the plaintiff's claim for twenty-five dollars constituted an unreasonable refusal to grant relief made in bad faith with knowledge or reason to know that the act or practice complained of violated c. 93A. Accordingly, the judge doubled the compensatory damage award against each defendant, resulting in a collective judgment of $5,000,000 plus interest and attorneys' fees. The defendants then filed posttrial motions for a remittitur or in the alternative for a new trial. They were denied. The defendants appealed, claiming only that the judge erred in the assessment of multiple damages; they do not contest the jury's verdict of $1,250,000. We decide that the judge's ultimate conclusion that the defendants' offer of settlement in response to the plaintiff's claim constituted an unreasonable settlement offer made in bad faith was clearly erroneous. Accordingly, we reverse that part of the judgment awarding multiple damages.

Whether the defendants' settlement proposal was an unreasonable refusal or made in bad faith was a question of fact. *Patry* v. *Harmony Homes, Inc.*, 10 Mass. App. Ct. 1, 6 (1980).[3] The defendants bore the burden of proving that their settlement offer was reasonable and made in good faith in light of the demand and attendant circumstances. *Kohl* v. *Silver Lake Motors, Inc.*, 369 Mass. 795, 799 (1976). This determination required proof that the defendants did not act deliberately to derail the settlement process. Otherwise stated, a wrongdoer "ought not wear out the claimant by unduly delaying settlement," *Miller* v. *Risk Mgmt. Foundation of Harvard Med. Insts., Inc.*, 36 Mass. App. Ct. 411, 418 (1994), when liability, including causation and damages, is clear or

---

[3]A reasonable settlement offer limits a landlord's liability. *Hartford Cas. Ins. Co.* v. *New Hampshire Ins. Co.*, 417 Mass. 115, 121 (1994). An offer found to be unreasonable or made in bad faith would not only fail to limit liability but would also expose the landlord to multiple damages. G. L. c. 93A, § 9(3).

highly likely. *Guity* v. *Commerce Ins. Co.*, 36 Mass. App. Ct. 339, 343 (1994). In these circumstances, rather than relying on arguments of counsel, the judge should have conducted an evidentiary hearing before arriving at the conclusion that the defendants' offer of settlement was made in bad faith and they thus were responsible for multiple damages. *Bissanti Design/Build Group* v. *McClay*, 32 Mass. App. Ct. 469, 471 (1992). However, this omission does not hinder our review. Even if we accept the representations made by the plaintiff's counsel at oral argument and construe the facts revealed by the record in the light most favorable to the plaintiff, the defendants' conduct fails to rise to the level necessary to trigger an award of multiple damages under the bad faith settlement aspect of G. L. c. 93A, § 9(3).

Bad faith may be either subjective or objective. *Hartford Cas. Ins. Co.* v. *New Hampshire Ins. Co.*, 417 Mass. at 120. See also *Massachusetts Adventura Travel, Inc.* v. *Mason*, 27 Mass. App. Ct. 293, 297 (1989) (construing G. L. c. 231, § 6F). Subjective bad faith may be established by direct evidence that a defendant was "motivated by subjective bad faith" even where, "on an objective standard of reasonableness," he "would have been warranted in not settling a case." *Hartford Cas. Ins. Co.* v. *New Hampshire Ins. Co.*, 417 Mass. at 123. See also *DiMarzo* v. *American Mut. Ins. Co.*, 389 Mass. 85, 97 (1983) (evidence warranted conclusion that defendant "did not have a bona fide belief in the reasonableness of its position"); *Miller* v. *Risk Mgmt. Foundation of Harvard Med. Insts., Inc.*, 36 Mass. App. Ct. at 419-420. Objective bad faith may be found where a potential defendant offers "much less than a case is worth in a situation where liability is either clear or highly likely." *Guity* v. *Commerce Ins. Co.*, 36 Mass. App. Ct. at 343. See also *Heller* v. *Silverbranch Constr. Co.*, 376 Mass. 621, 628 (1978) (the standard for "knowledge or reason to know" that defendant had violated c. 93A is "objective and requires the defendant to investigate the facts and consider the legal precedents").

Against this roundup of the cases, nothing in the record supports the judge's finding of a bad faith failure to settle. The underlying suit was commenced in 1989. On September 18, 1992, the plaintiff sent G. L. c. 93A, § 9, demand letters to each defendant with an attached neuropsychological evaluation from Dr. Francesca LaVecchio, who examined the

plaintiff some three years after commencement of the lawsuit.[4] She was of the opinion that the plaintiff, who was five years old, had "low average intellectual ability," appeared "at risk [for], or exhibit[ing], learning disabilities," was "below age level performances on pre-academic skill testing," and manifested neurobehavioral "symptoms . . . consistent with Attention Deficit Hyperactivity Disorder." "Overall," her report concluded, "his results are consistent with his known history of lead poisoning." At some time before responding to the plaintiff's claim letter, the defendants were also sent a summary report from Dr. John Rosen, a pediatrician specializing in the field of childhood lead poisoning, who had reviewed Dr. LaVecchio's report as well as plaintiff's medical records, and concluded that the plaintiff had suffered "neuropsychological deficits" due to ingestion of lead in his home. The plaintiff provided no documentation of the extent, value, or permanency of damages and demanded $500,000 compensation.

Before responding to the demand letter, the defendants consulted their own medical expert, Dr. Edgar Oppenheimer, a pediatric neurologist. He reviewed the two reports and medical records, as well as the plaintiff's one year of school records from the Early Childhood Development Head Start School Program, which neither of the plaintiff's experts had seen. Dr. Oppenheimer concluded that the plaintiff had "had mildly elevated lead levels (recorded between 01/25/89 and 07/13/89)." He stated that Dr. LaVecchio's diagnosis of Attention Deficit Disorder was based on observations "not objectively quantitated" and therefore "unscientific" and that the diagnosis was contradicted by the observations of the plaintiff's Head Start teachers, who had had the opportunity to observe him over an entire year. Dr. Oppenheimer further pointed out that the plaintiff's I.Q. was "in the average range" and noted that tests of academic, cognitive, and language skills must be evaluated in the context of a child's prior experience in and exposure to those areas, as well as his family history.

Dr. Oppenheimer's report questioned each of Dr. LaVecchio's conclusions. The defendants submitted in their re-

---

[4]After the plaintiff was referred to Dr. LaVecchio, and after the plaintiff rejected the defendants' response to the demand letter, the complaint was amended (three years after filing) to include a claim under c. 93A.

sponse letter that at trial Dr. Oppenheimer would opine that one could not attribute to a reasonable degree of medical certainty any of the plaintiff's difficulties in academic ability and cognitive skills — if in fact any difficulties existed — to the mildly elevated levels of lead found in his blood from January to July, 1989.

At the hearing before the judge on the c. 93A claim, the plaintiff argued two discrete points. First was his contention that the defendants denied liability when they "clearly knew they were liable." Second, the plaintiff maintained that the defendants' response letter was a "complete misrepresentation" of what Dr. Oppenheimer eventually testified to at trial. Neither argument is supported by the record.

The first argument is disingenuous in its use of the term "liable." Although summary judgment on the element of liability was entered against the defendants,[5] the defendants have all along contested not liability but causation and damages. Indeed, neither negligence nor knowledge of the risk is required to establish liability under G. L. c. 111, § 199. See *Bencosme* v. *Kokoras,* 400 Mass. 40, 43 (1987). What was really at issue was whether there was a causal connection between the plaintiff's blood lead levels and the injury suffered. See *Kohl* v. *Silver Lake Motors, Inc.,* 369 Mass. at 800-801; *Massachusetts Farm Bureau Fedn., Inc.* v. *Blue Cross of Mass., Inc.,* 403 Mass. 722, 730 (1989) ("In the absence of a causal relationship between the alleged unfair acts and the claimed loss, there can be no recovery"). Further, the defendants denied that any compensable injury had occurred, consistent with their token offer of twenty-five dollars, the statutory minimum amount recoverable where a c. 93A violation is found but no damages result. G. L. c. 93A, § 9(3). *Leardi* v. *Brown,* 394 Mass. 151, 159-160 (1985) (where there has been an invasion of a legally protected interest, but no harm for which actual damages can be awarded, the minimum statutory award is twenty-five dollars). In essence, they acknowl-

[5]General Laws c. 111, § 199, provides for strict liability, and a violation occurs where it is shown that a plaintiff suffered elevated lead levels due to exposure to lead on the owner's premises. These facts were ultimately conceded by the defendants, and partial summary judgment entered. However, injury consists not of elevated lead levels but of cognitive difficulties caused by those levels. The questions thus remained open as to whether the plaintiff suffered any developmental problems and, if so, whether those problems were caused by the lead.

edged the plaintiff's elevated lead levels but denied that his academic, cognitive, and language difficulties, if existent, were caused by exposure to lead paint in the apartment.

As to the second argument, Dr. Oppenheimer's testimony at trial, if at all different from what was projected, differs in such minor respects that it cannot be said that the representations in the response letter were made in bad faith. The plaintiff's counsel points to only three examples where the testimony contradicts earlier representations. We address these seriatim.

The first involves Dr. Oppenheimer's notation in his report that the child was only lead poisoned for six months, but the records clearly indicate that he was lead poisoned over a period of from fifteen to seventeen months. While his report did state that the plaintiff had mildly elevated lead levels recorded during a six-month interval, Dr. Oppenheimer was not questioned on this point at trial, leaving uncontested the plaintiff's figure of from fifteen to seventeen months. There is no indication that, if cross-examined on the point, Dr. Oppenheimer would have testified differently than represented in the letter. The issue is not as straightforward as the plaintiff suggests, since, by the plaintiff's own expert testimony, in 1991 the Center for Disease Control officially changed the levels at which lead is considered toxic from twenty-five micrograms per deciliter to ten micrograms per deciliter. Thus, on the dates the plaintiff was tested (from January 25, 1989, until April 18, 1990), his blood lead levels would only have been considered toxic during the six-month period identified by Dr. Oppenheimer.

The plaintiff's second example of inconsistency is that in the response letter Dr. Oppenheimer "reject[ed] the diagnosis of attention deficit disorder and hyperactivity" and claimed that "lead was not a cause," but "at trial he acknowledged the child had attention deficit disorder." Again, the record does not permit the construction offered by the plaintiff. The response letter and the attached report do not state that Dr. Oppenheimer rejected the diagnosis, but rather that he "reject[ed] the conclusion" that a diagnosis of attention deficit disorder has a scientific basis, given that the test for attention deficit disorder is subjective. The portion of the transcript upon which the plaintiff relies reveals that at trial, although he acknowledged that *Dr. LaVecchio* diagnosed attention def-

icit disorder,[6] Dr. Oppenheimer stressed that he would not necessarily reach the same diagnosis given the conflicting Head Start records. When directly asked his own opinion, Dr. Oppenheimer stated, "where there [are] conflicting opinions of such a situation . . . there probably is additional information that might be necessary to firm this up." As to whether lead was the cause of the purported attention deficit disorder, Dr. Oppenheimer further stated, both in his report and before the jury, that the most common cause of attention deficit disorder is heredity; lead cannot be conclusively established as the cause unless heredity is ruled out. Dr. Oppenheimer states in his report that, without further information regarding the plaintiff's "genetic endowment and social environment," it would be "absurd" to pinpoint lead as the sole cause of any problems he may have. The defendants' response letter properly requests further information regarding the plaintiff's family history, stating that they would reconsider their offer upon receipt of such records. When questioned at trial whether there was anything else but lead that could have caused the plaintiff's condition, Dr. Oppenheimer similarly responded, "*I had limited records of the family*, but from what I had, I found nothing else" (emphasis supplied). Again, on this point, Dr. Oppenheimer's testimony seems not inconsistent, and certainly not blatantly antithetical to that represented in the response letter.

Finally, the plaintiff claims that Dr. Oppenheimer "reject[ed] the notion that [the plaintiff] had language disabilities" but gave no testimony to that effect at trial. In his report, Dr. Oppenheimer does not "reject" the plaintiff's test results, but points out that some of the test scores were unreliable given his young age, some of the results indicating disability were contradicted by the Head Start records, and some fell within the low average, but normal, range. At trial, he reiterated that low scores on spelling and mathematical ability were not indicative of brain function in a child as young as five years old, that Head Start records showed a child of normal development, and that his I.Q. on verbal skills was in the normal range. It cannot be said that his testimony differed significantly from what it was purported to be in the re-

---

[6]Dr. Oppenheimer was asked, "Based upon Dr. LaVecchio's report, would you agree *she diagnosed* attention disorders, isn't that correct?" (emphasis supplied). He responded, "That's correct."

sponse letter, nor can it be said that such divergence, if any, constituted bad faith on the part of the defendants.

There is no evidence that the defendants acted in a deliberate attempt to derail the settlement process, or to litigate a claim in which causation and damages were clear. Faced with limited information about causation, the defendants had consulted a qualified physician who questioned the plaintiff's contentions that he had suffered any damages, or that such damages had been caused by the elevated levels of lead in his blood. The plaintiff's demand letter did not indicate that his alleged developmental delays were either long-term or permanent. At trial, the plaintiff pegged his case on subsequent and more conclusive evaluations made by Drs. LaVecchio and Rosen one year after the demand letter and on three notes from the Head Start program discovered at the beginning of the first trial, which were the only indication that the plaintiff was having trouble in school.[7] Further, at the trial, the plaintiff presented detailed testimony of the two experts as to the extent of and damage due to the plaintiff's injuries. None of this information was available at the time the defendants responded to the demand letter. A review of opinions dealing with the adequacy of response letters indicates that the full extent of damages in those cases became clear at the earliest stages of litigation, and damages were generally readily quantifiable.[8] As chapter 93A damages become more abstract, see *Haddad* v. *Gonzalez*, 410 Mass. 855, 866 (1991) (c. 93A

---

[7]Indeed, the first trial, begun on June 8, 1993, was declared a mistrial when the notes came to light for the first time on the second day of the trial. The letters were deemed particularly vital evidence because they "showed behavior problems that were not indicated, and in fact were inconsistent with the child's pre-school head-Start program records."

[8]See *Kohl* v. *Silver Lake Motors, Inc.*, 369 Mass. 795 (1976) (purchase of automobile requiring "excessively frequent and extensive repairs"); *Burnham* v. *Mark IV Homes, Inc.*, 387 Mass. 575 (1982) (leaky roofs and frozen pipes in modular homes); *Calimlim* v. *Foreign Car Center, Inc.*, 392 Mass. 228 (1984) (purchase of used car requiring extensive repairs); *Briggs* v. *Carol Cars, Inc.*, 407 Mass. 391 (1990) (purchase of car that required considerable repair work); *Giannasca* v. *Everett Aluminum, Inc.*, 13 Mass. App. Ct. 208 (1982) (faulty roof work and installation of vinyl siding); *Bachman* v. *Parkin*, 19 Mass. App. Ct. 908 (1984) (faulty construction of solar-heated house); *Brown* v. *LeClair*, 20 Mass. App. Ct. 976 (1985) (landlord/tenant dispute involving leaks, flooding, cockroaches, and an assault on the premises); *Squeri* v. *McCarrick*, 32 Mass. App. Ct. 203 (1992) (wrongful eviction); *Miller* v. *Risk Mgmt. Foundation of Harvard Med. Insts., Inc.*, 36 Mass. App. Ct. 411 (1994) (burns to leg caused by accidental

damages compensate for foreseeable loss, including emotional distress); see also *Nader* v. *Citron*, 372 Mass. 96, 97 (1977) ("The scope of c. 93A has come before us with increasing frequency"), we must not engage in "Monday morning quarterbacking." Caution demands that we narrowly construe whether the "demand letter reasonably set forth the acts relied on," *Piccuirro* v. *Gaitenby*, 20 Mass. App. Ct. 286, 292 (1985), and focus on the attendant facts and circumstances as they existed at the time of the demand.[9] *Calimlim* v. *Foreign Car Center, Inc.*, 392 Mass. 228, 234 (1984). Otherwise, we may place "an impossible burden on a defendant responding to a demand letter to be absolutely right, and not merely reasonable in [the] approach to making an offer." Warshaw, Massachusetts Landlord-Tenant Law § 9:6 (Supp. 1995).

In our decision today, we keep company with cases that have examined the definition of bad faith in other contexts and have similarly concluded that it is only in the rare and exceptionally egregious case that such a finding should be made. It has been held that bad faith is "not simply bad judgment." *Spiegel* v. *Beacon Participations, Inc.*, 297 Mass. 398, 416 (1937), and cases cited. "It is not merely negligence. It imports a dishonest purpose or some moral obliquity. It implies conscious doing of wrong. It means a breach of a

---

use of high intensity light rather than an operating lamp during surgery); *Whelihan* v. *Markowski*, 37 Mass. App. Ct. 209 (1994) (lacerations, scarring, and five percent permanent disability in right arm as a result of shattering glass).

[9]Indeed, case law suggests, in the context of insurance claims, that courts be vigilant to ensure that plaintiffs not engage in "reverse bad faith" conduct. See *Twin City Fire Ins. Co.* v. *Country Mut. Ins. Co.*, 23 F.3d 1175, 1180 (7th Cir. 1994), citing *Transit Cas. Co.* v. *Spink Corp.*, 94 Cal. App. 3d 124 (1979) ("duty of good faith between insured and insurer is a reciprocal one"). Here too, the plaintiff has a reciprocal duty to be straightforward and forthcoming in providing the information necessary to the defendant's evaluation of the case. We note with dismay that a supplemental answer to interrogatories was mailed to the defendants one day after the settlement offer was made, fully ten months after the interrogatories were first propounded. This supplemental answer set forth for the first time the identity and expected testimony of all of the plaintiff's expert witnesses, including new testimony by Dr. Rosen concerning the "causal relationship between low level childhood lead poisoning and future educational and vocational success," as well as the testimony of an economist and a vocational expert concerning the monetary cost of the plaintiff's injuries.

known duty through some motive of interest or ill will." *Ibid.* We conclude that, "in a complex factual and legal entangle-ment such as this, it would be grossly unfair to bring down the potent weaponry of chapter 93A upon one who may guess wrongly about what a court will ultimately do with the problem." *Waste Mgmt. of Mass.* v. *Carver*, 37 Mass. App. Ct. 694, 699-700 (1994).

In sum, it is apparent from the record that the defendants satisfied their burden of showing that their response to the plaintiff's demand letter was reasonable and not made in bad faith based on the attendant circumstances. As a result, the judge's conclusion to the contrary was clearly erroneous. In light of our decision, it is unnecessary to reach the other is-sues regarding the assessment of multiple damages raised by the defendants.

The judgment insofar as it awards multiple damages and attorneys' fees to the plaintiff under G. L. c. 93A is reversed. The judgment is otherwise affirmed.

*So ordered.*