Cowin, J.
*390 BACKGROUND
The plaintiffs brought this action against the defendants Brookline Ice and Coal Co. (BICC) and Liberty Mutual Insurance Co. (Liberty) for damages for injuries arising from the wrongful delivery of oil to 20 Elm Street, Brookline (the premises) by BICC and the resulting fire at said premises. The plaintiffs sought recoveiy for negligence, breach of contract, trespass, negligent infliction of emotional distress, violation of G.L.c. 21E and violation of G.L.c. 93A. Individually, plaintiffs Martha Wisler and William Jack Ward claimed damages for emotional distress injuries and for personal property and rental income losses. As parents and representatives of Nicholas Ward, John Ward and Olivia Ward, Martha Wisler and Jack Ward also sought recovery for emotional distress injuries incurred by their children. Finally, Ping Condominium Association[3] also claimed physical damage to the condominium structure.
The matter was tried before the Court and a jury from November 13, 1995 through December 7, 1995. Before trial, the Court bifurcated the G.L.c. 93A claim, reserving it for a later non-jury hearing.
After three and one half weeks of trial, the jury returned a verdict awarding $85,000 to Martha (the wife) and $15,000 to Nicholas (one of the children). In reaching their determination, the jury answered the following special questions:
Q. 1. Have the plaintiffs been fairly compensated for any damages sustained by them, which were causally related to the fire incident on December 1, 1989?
Q.2. If you[r] answer to question 1 was no, what additional amount will fairly compensate each of the following for any damages causally related to the events in issue?
After the second question, each plaintiff was individually listed and blank spaces were provided for any amounts that might be awarded. No damages were awarded to Jack, Martha’s husband, or any of the children other than Nicholas. Ping Condominium Association also recovered no damages.
After trial, Liberty moved for dismissal of the plaintiffs’ G.L.c. 21E claim for costs and attorneys fees. After a hearing on this issue on June 12, 1996, this Court issued a memorandum and order that fees were not to be awarded [5 Mass. L. Rptr. No. 32, 725 (November 11, 1996)].
The latest chapter in this case was a six-day jury-waived trial held by the Court June 13-June 20, 1997 on plaintiffs’ claims for damages against Liberty pursuant to G.L.c. 93A and c. 176D and against BICC for damages pursuant to G.L.c. 93A.[4] The witnesses who testified at this trial were Martha Wisler; Mr. Michael Brown, the insurance adjuster for Liberty Mutual; Augustine Signore, the owner of the defendant BICC; Andrew Patey, an oil delivery driver in the employ of BICC; and Richard Grahn, Esq., an attorney representing the plaintiffs in connection with this matter.
FINDINGS OF FACT
Based upon the evidence presented at trial, the reasonable inferences to be drawn therefrom, and evaluation of the credibility of the witnesses, I find as follows.
1. The plaintiffs Martha Wisler (Ms. Wisler) and Jack Ward (Mr. Ward) (collectively the Ward-Wislers) and their three children lived at 20 Elm Street, Brook-line. The building in which they lived was formerly a two-family house that was converted into two condominiums: the plaintiffs’ unit (20 Elm Street) and the adjacent unit (18 Elm Street). Ping Condominium Association was the condominium homeowners’ association for the two units and consisted of the plaintiffs and the owners of 18 Elm Street, Nan Stromberg (Stromberg) and Barbara Butwinick (Butwinick).
2. The heating system for 18 and 20 Elm Street was converted from oil to gas heat in the 1980’s. The oil tank was removed; the fill pipe, however, was not removed and was left uncapped.
3. On December 1, 1989, Andrew Patey (Patey), an oil delivery driver for defendant BICC, mistakenly made a delivery of home heating oil to the fill pipe connected to the basement of the Stromberg-Butwinick unit at 18 Elm Street. The oil spilled into the basement of 18 Elm Street and ignited, causing a fire in the basement of 18 Elm Street only and the release of smoke into both units.
4. The Brookline Fire Department was called to the site and extinguished the fire.
5. All of the residents of both 18 and 20 Elm Street safely left the building.
6. Patey, the BICC driver, initially lied and denied having delivered oil to the home, but a few days later admitted that he had in fact delivered the oil to 18 Elm Street by mistake.
7. The plaintiffs vacated 20 Elm Street and moved to rented premises at 31 Linden Street, Brookline.
8. Defendant Liberty Mutual Insurance Co. (Liberty) insured BICC.
9. Liberty assigned Michael Brown (Brown) to handle the plaintiffs’ damage claim against its insured.
10. At the suggestion of Brown, the plaintiffs filed claims with Metropolitan Insurance Co. (Metropolitan), which provided their homeowners’ insurance, and with Great American Insurance Co. (Great American), which provided insurance coverage for the building structure.
11. After the fire, it was necessary to remove the oil-contaminated soil from the premises. The plaintiffs, through their attorney Richard Grahn, selected and hired SEA Consultants (SEA) to manage and coordinate the oil remediation project. Liberty and *391 Great American agreed to the plaintiffs’ selection of SEA.
12. On January 31, 1990, SEA provided a written estimate of expected work involved in the remediation project. SEA estimated that total costs for the project would be in the range of $67,550 to $79,550.
13. Brown and a representative of Great American authorized SEA to proceed with the project as outlined in SEA’s January 31, 1990 correspondence.
14. In December 1989 and January 1990, Liberty accepted the liability of its insured and agreed to pay for the reasonable damages causally related to the incident.
15. Within two weeks after the fire, Liberty hired a construction expert, Bessom and Tilton, to inspect the premises and provide an estimate for repair of 20 Elm Street and structural work to the building (excluding environmental related work). Bessom and Tilton advised Liberty that the cost of repairing 20 Elm Street would be approximately $15,979.
16. Liberty also hired Geraghty and Miller (G&M), an environmental expert, to review the work of SEA. G&M questioned SEA’s accounting and bookkeeping procedures and some of the construction methods used by SEA, but agreed that the construction methods used by SEA were generally acceptable.
17. Brown inspected 20 Elm Street on December 11, 1989 and December 19, 1989 and observed minimal damage, except for smoke and soot.
18. It was agreed that the plaintiffs would submit claims to their own insurers (Great American and Metropolitan) and these insurers would make appropriate payments to the plaintiffs. The plaintiffs’ insurers planned to resolve any subrogation issues with Liberty at a later date.
19. The following payments were made by Great American in regard to work at 20 Elm Street: January 10, 1990, $3,187.25 to Service Master by Gilmore Bros.; January 11, 1990, $30,000 to Enpro; and April 20, 1990, $2,715 to Service Master by Gilmore Bros.
20. On January 17, 1990, Liberty issued a $25,000 payment to the Ward-Wislers, Stromberg, Butwinick, and Elk Berman Adjusters, an adjuster working for Great American.
21. Liberty also issued the following payments to the contractors working on the remediation project: April 18, 1990, $1,550 to Executive Pools Limited; May 4, 1990, $16,681.75 to Enpro; and May 16, 1990, $8,428 to ICOS.
22. On May 21, 1990, Brown wrote to counsel for the condominium association seeking further information about the scope of the remediation project.
23. On May 30, 1990, SEA provided a revised estimate of future remediation costs and asked that Brown increase the allocation from Liberty to a “not-to-exceed figure of $200,000."
24. On May 21, 1990, Brown issued a $7,500 payment to the Ward-Wislers for alternative living expenses. At this point, the Ward-Wislers had already received $10,000 for alternative living expenses from their own insurer, Metropolitan, and had also been reimbursed $2,493 by Metropolitan for cleaning expenses incurred by VIP Cleaners.
25. On June 13, 1990, the Ward-Wislers received an additional $7,500 payment from Metropolitan.
26. On June 21, 1990, Brown issued an $11,823.50 payment to Environmental Waste Technology- for work performed during the remediation project.
27. On June 22, 1990, SEA again increased its previous estimates of remediation costs, now seeking an allocation of $255,270.60. On April 24, 1991, SEA further raised its cost estimate to $312,000. This was increased by SEA to $345,000 in July, 1991 with yet a further increase in August, 1991.
28. On July 9, 1990, the Ward-Wislers were reimbursed an additional $2,329 by Metropolitan for cleaning expenses incurred by VIP Cleaners.
29. On July 20, 1990, Great American issued a $20,000 payment to Ping Condominium Association.
30. On July 24, 1990, Brown issued a $47,000 payment to SEA Consultants.
31. On August 7, 1990, Brown wrote to A1 Hanscomb of SEA regarding the need for Liberty to investigate the reasons for the 300%-400% increases in SEA’s original estimates. Brown advised Hanscomb that he was not withholding or delaying payment and that “this letter will be my bond to you to continue to attempt to resolve all the aspects of this problem as quickly and as professionally as possible and to alleviate any concerns your company may have about being paid.”
32. Liberty, concerned from the outset about the amount of oil that had actually spilled on the premises, sought assistance from G&M (Liberty’s environmental expert) on this matter. G&M questioned whether 150 gallons had been spilled as the plaintiffs claimed or whether only 26 gallons had been spilled as was claimed by BICC. G&M concluded that it was quite possible that weathered fuel oil may have been present on the site prior to the fire due to the earlier conversion of the heating system. As a result, it was impossible to determine exactly how much oil BICC had spilled.
33. On August 14, 1990, Brown issued a $50,000 payment to SEA.
34. On August 14, 1990, Great American issued a $16,914.42 payment to Elk-Berman Adjusters.
35. On August 7, 1990, Brown wrote to SEA questioning its management of the project and the substantial increases in its earlier estimates.
36. Thereafter, it was agreed that Looney & Gross-man, the attorneys representing both the condominium association and the owners of 18 Elm Street, *392 would handle disbursements from Liberty to fund the project and to reimburse the individual owners.
37. On September 7, 1990, the Massachusetts Department of Environmental Protection issued a clearance letter on the property.
38. As Victor Fontkem, Environmental Engineer at the Department of Environmental Protection, testified, this was a relatively small incident; all the remediation work was done voluntarily without DEP mandates; and DEP was fully satisfied as of September 1990 that the remediation had been performed in accordance with Massachusetts law in an acceptable fashion.
39. By September 1990, the Stromberg-Butwinicks had moved back into their residence at 18 Elm Street. The Ward-Wislers’ tenant on the third floor of 20 Elm Street had also returned to her apartment.
40. On October 5, 1990, the Ward-Wislers received a further payment of $62,546.85 from Metropolitan.
41. On November 19, 1990, Great American issued a $26,308 payment to Ping Condominium Association.
42. On November 26, 1990, Brown issued a $105,000 payment to Looney & Grossman.
43. On February 4, 1991, Brown issued a $31,000 payment to Looney & Grossman.
44. As the work proceeded, Brown became increasingly concerned about the rapidly escalating costs, how the allocated monies were actually being spent and duplication of payments made by the three insurers. He also questioned why the plaintiffs had not returned to 20 Elm Street in the fall of 1990, the plaintiffs’ possible overvaluing of their personal property and seeking replacement value instead of fair market value, and the plaintiffs’ requests for reimbursement for work which actually constituted upgrading and remodeling of the home. These concerns are reflected in Brown’s May 9, 1991 and May 22, 1991 letters to the plaintiffs.
45. On October 4, 1991, Brown issued a $19,500 payment to Enpro.
46. On October 23, 1991, Brown issued a $60,500 payment to Looney & Grossman.
47. On January 13, 1992, Liberty received a Chapter 93A demand letter from counsel for the WardWislers. The demand letter incorporated a document entitled “Details of Damages,” which set forth several different categories of alleged damages, including loss of personal property, physical damage to the condominium, alternative living expenses while displaced from the condominium, loss of earning capacity as a result of the incident, child care expenses, loss of value of the premises, loss of use of funds, claims expenses, emotional distress damages and medical expenses. The plaintiffs’ total settlement demand was in the amount of $1,799,601.11.
48. Of the total demand, the plaintiffs demanded payment in the amount of $1,333,200 for emotional distress damages. The plaintiffs’ demand also included $124,000 for past and future medical bills for medical and psychiatric treatment allegedly related to the emotional distress of the plaintiffs and their children. A large part of the claimed medical expenses were not actual expenses but future expenses projected to 1996. The plaintiffs’ demand also included an additional $25,000 for “travel expenses” related to such treatment.
49. The settlement package did not contain supporting bills and documentation or any medical or psychiatric records or reports of the plaintiffs’ treatment providers, nor did it contain any actual bills for medical or psychiatric treatment.
50. After receiving the plaintiffs’ Chapter 93A demand, Brown requested that plaintiffs’ counsel produce the plaintiffs’ treatment records and bills, and, in its February 14, 1992 written response to the plaintiffs’ Chapter 93A demand, Liberty’s counsel requested that plaintiffs’ counsel produce treatment records and bills.
51. On June 18, 1992, Brown issued a $66,500 payment to Looney & Grossman.
52. Plaintiffs’ counsel provided a further itemization of the plaintiffs’ alleged damages entitled “Details of Damages" on July 28, 1992. No medical records, reports, or bills were submitted with this itemization.
53. The plaintiffs filed the instant lawsuit on November 5, 1992.
54. On April 30, 1993, the parties attended a mediation session but did not reach a settlement agreement. Counsel for the Ward-Wislers and Michael Brown continued to negotiate following the mediation.
55. On May 17, 1993, Brown issued a $29,500 payment to the Ward-Wislers.
56. On October 6, 1993, Great American issued a $33,408.19 payment to plaintiffs’ counsel on behalf of the plaintiffs.
57. By October 1993, Great American had made payments totalling $98,305.76 to the Ward-Wislers and the Stromberg-Butwinicks for the claims of Ping Condominium Association and alleged physical damage to the condominium units.
58. On July 8, 1994, counsel for Liberty offered the Ward-Wislers $65,000 to settle all claims in the case. Plaintiffs’ counsel advised Liberty that plaintiffs were demanding $975,000 to settle the case.
59. In July, 1994, Liberty settled the claims brought by Nan Stromberg and Barbara Butwinick individually and as members of the. Ping Condominium Association. As a result, the only claims remaining were those of the plaintiffs in this case.
60. On October 3, 1994, counsel for Liberty repeated Liberty’s request that the plaintiffs’ counsel provide copies of all pertinent medical records and *393 verify information concerning plaintiffs’ claims for damages.
61. On October 5, 1994, counsel for Liberty again wrote to plaintiffs’ counsel requesting production of the plaintiffs’ treatment records.
62. On November 15, 1994, Liberty filed a motion for leave to conduct limited discovery to obtain the plaintiffs’ treatment records and bills. The plaintiffs opposed this motion.
63. On December 1, 1994, in response to Liberty’s request and over the plaintiffs’ opposition, the Court (Butler, J.) ordered that the medical records be produced unless the plaintiffs agreed to waive their damage claims in this area at trial.
64. In accordance with the Court’s order, counsel for Liberty served subpoenas upon Keeper of the Records of the plaintiffs’ treatment providers on December 15, 1994, scheduling their depositions for December 23, 1994.
65. In response to the December 1994 subpoena, Dr. Margaret Myer produced treatment records to counsel for Liberty on January 5, 1995.
66. On January 21, 1995, Martha Wisler’s psychiatrist, Dr. Timothy Dugan, produced his treatment records to counsel for Liberty in response to the December 1994 Keeper of the Records Subpoena.
67. On February 21, 1995 and March 14, 1995, Dr. Bessel Vander Kolk produced psychiatric evaluations and other records to counsel for Liberty in response to the December 1994 Keeper of the Records Subpoena.
68. On June 12, 1995, Metropolitan paid an additional $15,250 to the Ward-Wislers.
69. The total amount paid to plaintiffs or their contractors was $653,407.86. The total amount paid out by Liberty, including payments to plaintiffs, then-contractors and subrogation payments was $607,858.25.
70. Trial of the plaintiffs’ underlying damage claims commenced on November 13, 1995, and concluded in December, 1995. The jury returned a verdict of $85,000 for Martha Wisler and $15,000 for Nicholas Ward. The jury returned a verdict for the defendants on the claims of Ping Condominium Association, William Ward, John Ward and Olivia Ward.
71. Liberty did not engage in unfair or deceptive business practices.
72. Liberty did not violate G L.c. 93A.
BROOKLINE ICE AND COAL COMPANY
73. Patey’s predominant motive for lying about his mistaken delivery of oil to the fill pipe at 18 Elm Street was to benefit himself. He was not acting in furtherance of BICC’s interests.
74. Patey’s knowledge of the mistaken delivery of oil was not imputable to BICC.
75. Despite Patey’s denial of delivering oil to 18 Elm Street, BICC undertook a reasonable investigation to determine if its driver had in fact mistakenly delivered oil to the premises
76. BICC acted reasonably and in good faith when it initially denied responsibility for the mistaken oil delivery.
77. BICC did not obtain knowledge of its responsibility for the mistaken delivery at 18 Elm Street until December 4, 1989. On that date, three days after the fire, BICC admitted responsibility for its driver’s mistake.
78. On that same date, December 4, 1989, BICC notified its insurance carrier, Liberty, that it was responsible for the mistaken delivery of oil to the fill pipe at 18 Elm Street.
79. The plaintiffs’ Chapter 93A demand letter fails to set out with specificity the activities as to which they seek relief against BICC.
80. BICC did not act willfully or in bad faith with respect to the mistaken delivery of oil at 18 Elm Street.
81. BICC did not engage in unfair or deceptive business practices.
82. BICC did not violate G.L.c. 93A.
DISCUSSION
As the above findings indicate, Liberty appears to have acted quite reasonably under the circumstances, given the size of plaintiffs’ claims; the amorphous nature of some of the claims; the inference that at least some of the claims were exaggerated; the substantial amounts that Liberty paid as its investigation was ongoing; the questions about plaintiffs’ refusal to return to the premises thereby increasing their damages; the large amount sought for emotional distress damages and the plaintiffs’ refusal to provide medical documents to substantiate these claims despite repeated requests by Liberty. On the basis of all this, I do not find that Liberty has acted in any way in violation of its obligation to its insured or in violation of G.L.c. 176D or G.L.c. 93A.
BICC’s driver lied regarding the delivery of the oil. His lie, however, does not impose c. 93A liability upon BICC. Further, once BICC became aware of the lie, it did not violate c. 93A either in terms of its investigation to ascertain that the driver had lied or the steps BICC took once it determined that the driver had lied.
While plaintiffs have suffered an alarming experience, they have been amply compensated first by voluntary payments by a number of insurers and then by a Superior Court jury’s award. Significant time and expense have been consumed by the necessity of adjudicating Chapter 93A claims which have no basis on this record.
*394 RULINGS OF LAW
A. LIBERTY MUTUAL
1. The purpose of G.L.c. 93A is to encourage insurers to act reasonably in responding to a plaintiffs settlement demand, to foster settlements where appropriate, and to discourage insurers from forcing claimants into unnecessary litigation.
2. In a claim for unfair settlement practices, the Court must determine, in the particular circumstances, and in light of the plaintiffs demand, whether the payments or settlement offer were reasonable.
3. A duty to settle does not arise until liability becomes reasonably clear.
4. Insurance companies are not to be penalized for delaying in good faith because damages are unclear or questionable and require further investigation.
5. If the insurer acted reasonably in responding to a demand letter, it is insulated from liability under Chapter 93A.
6. In determining whether the demand letter reasonably set forth the facts, the focus is upon the attendant facts and circumstances as they existed at the time of the demand.
7. It is only in the rare and exceptionally egregious case that a finding of bad faith should be made. Bad faith is not simply “bad judgment” or “negligence, but imports a dishonest purpose or some moral obliquity.” Parker v. D’Avolio, 40 Mass.App.Ct. 394, 402-03 (1996).
8. Bad faith implies conscious doing of wrong. It means a breach of a known duty through some motive of interest or ill will.
9. In the context of insurance claims, the courts must be vigilant to ensure that plaintiffs do not engage in “reverse bad faith conduct.” The plaintiff has a reciprocal duty to be straightforward and forthcoming in providing the information necessary to the defendant’s evaluation of the case. Id. at 402, n.9.
10. The purpose of c. 93A is not to provide a means of engaging in "Monday morning quarterbacking” of an insurer’s settlement positions taken before trial. The insurer is simply required to be reasonable and need not be absolutely right.
11. Chapter 93A is not designed or intended to throw out all concepts of reasonableness and mitigation, or to allow injured parties to ignore probable and practical dispute resolution so they can conduct a prolonged request for excessive damages.
12. The evidence does not require a finding that Liberty acted unreasonably in handling the multiple and complicated claims asserted by the plaintiffs.
13. The evidence does not require a finding that Liberty, having made substantial payments, engaged in a dishonest purpose, moral obliquity, or conscious doing of wrong through some motive of interest or bad will.
14. The evidence does not require a finding that Liberty forced the plaintiffs into unnecessary litigation.
15. The plaintiffs, not having provided any supporting documentation for their medical and emotional distress claims with their Chapter 93A demand or at any time thereafter, cannot recover for violation of Chapter 93A.
16. Liberty’s Request No. 17 is a correct statement of law, but is irrelevant given the Court’s findings.
17. An employer or principal is not liable for the intentional acts of its employee or agent who acts from purely personal motives and not in furtherance of the employer’s interests.
18. Knowledge acquired by an agent while acting in a fraudulent manner for his own benefit, against the interests of his principal, is not imputed to the principal.
19. A misrepresentation of fact which is not reasonably ascertainable is not an unfair or deceptive act or practice within the meaning of c. 93A, §2.
20. There is no liability under c. 93A for failing to disclose what a person or entity does not know.
21. Chapter 93A requires claimants to set out specifically any activities in their demand letter as to which they seek relief. Separate relief on actions not so mentioned is foreclosed as a matter of law. Clegg v. Butler, 424 Mass. 413, 423 (1997); Bressel v. Jolicoeur, 34 Mass.App.Ct. 205, 211 (1993); Entrialgo v. Twin City Dodge, 368 Mass. 812, 813 (1975). See Spring v. Geriatric Authority of Holyoke, 394 Mass. 274, 287 (1985).
22. A negligent act, absent a showing of unfair or deceptive practices, does not give rise to c. 93A liability.
PLAINTIFFS
A. Plaintiffs’ First Requests
Plaintiffs’ first requests for findings of fact and rulings of law are all requests for findings or mixed requests for findings and rulings except for numbers 53, 54, 61, 65 and 66.
53. Denied as irrelevant based on the Court’s findings.
54. Denied as irrelevant based on the Court’s findings.
61. Allowed.
65. Denied.
66. Denied.
B. Plaintiffs’ Second Requests
1. Allowed.
2. Allowed.
3. Denied as irrelevant in light of the Court’s findings.
4. Allowed.
*395 5. Proper statement of law but denied as irrelevant given the Court’s findings.
6. Denied as a mixed request for finding and ruling.[5]
7. Neither request for finding or ruling.
8. Request for finding.
9. Correct statement of law but denied as irrelevant given the Court’s findings.
10. Argument.
11. “Garden variety” emotional distress damages can be established without expert testimony.
12. Request for finding of fact.
13. Request for finding of fact.
14. Denied as mixed request for finding and ruling.
15. Denied as mixed request for finding and ruling.
16. Request for finding of fact.
17. Request for finding of fact.
18. Request for finding of fact.
19. Allowed.
20. Request for finding of fact.
21. Denied as mixed request for findings and ruling.
C. Plaintiffs’ Third Requests
Plaintiff has submitted 258 numbered paragraphs under the heading “Plaintiffs’ Third Request for Findings of Fact and Conclusions of Law.” These requests consist primarily of mixed requests for findings of fact and rulings of law. A few are argument and some are actual requests for rulings of law.
The Court is not required to act on requests for findings of fact. As plaintiffs’ submission, excessive in number, mixes requests for findings of fact and rulings of law, the Court declines to act on any of the requests. The Court’s action on defendants’ requests for rulings adequately covers the subjects raised in that portion of the submission which actually contains requests for rulings.
ORDER FOR JUDGMENT
It is hereby ORDERED that judgment shall enter for the defendant Liberty Mutual Insurance Company on Count I and for defendant Brookline Ice & Coal Company on Count II.

 The premises are actually one part of a two-family structure that consists of numbers 18 and 20 Elm Street. Martha and Jack are the owners of 20 Elm Street. The individual owners of the two units comprise Ping Condominium Association.

 These claims are contained in Counts I and II, respectively.

 This request and other similar ones are denied as the Court is not required to isolate the legal portion of these mixed requests for findings and rulings, and I decline to do so.