Gordon, Robert B., J.
BACKGROUND
This case arises out of a December 2010 automobile accident between plaintiff Leo P. McCarthy (“plaintiff’ or “McCarthy”) and Ann Lee Weiner (“Weiner”). McCarthy was injured in the accident, and brought suit against Weiner for negligence and against her insurance company, Safety Insurance (“Safety” or the “insurer”) for claimed unfair settlement practices in violation of G.L.c. 93A, §11 and G.L.c. 176D, §3(9). The negligence claim against Weiner was bifurcated; and, following a three-day trial in this Court, a jury returned a verdict in favor of plaintiff (net of Personal Injury Protection benefits) in the amount of $16,522.50.
On March 16, 2015, plaintiffs statutory claims against Safety were tried to the undersigned, sitting ■without a jury. Plaintiff called just one adverse witness, Safety called none, and 21 documentary exhibits were admitted into evidence. The credible evidence established the following pertinent facts.
FINDINGS OF FACT
The Accident
On December 8, 2010, McCarthy was involved in an automobile accident in which his car was struck broadside by a vehicle driven by Weiner. Weiner was insured at the time by Safely, and carried liability coverage with a policy limit of $100,000. Weiner notified Safety of the accident on December 9, 2010; and on December 20, 2010, following an investigation by Senior Claims Adjuster Kara Smolinsky, Safety concluded that its insured was 100% at fault.
McCarthy’s Course of Treatment
On December 10,2010, two days after the accident, McCarthy began a course of medical treatments that would span ten months. McCarthy initially sought treatment from his primary care physician, Dr. Keith Nobil, at Family Doctors in Swampscott, Massachusetts. At that time, Dr. Nobil diagnosed McCarthy as having suffered a “mild cervical strain,” and prescribed a pain medication to manage the discomfort of a neck that was described as “a little sore.”
On January 5, 2011, McCarthy returned to Dr. Nobil, complaining of increased pain in his neck and intermittent tingling in his right shoulder. Contemporaneous medical records documented tenderness in McCarthy’s paracervical muscles, prompting Dr. Nobil to increase the dosage of his medication and prescribe physical therapy. McCarthy received periodic physical therapy at Spaulding Hospital between January 10 and March 18, 2011, and reports of these treatments reflect therapeutic progress in addressing his symptoms.
Upon McCarthy’s discharge from physical therapy (following 12 sessions), therapist notes contained in his medical record stated that “(pjatient’s slow progress may indicate premorbid OA in cervical spine that was exacerbated by MVA. Gains have plateaued.” Around the same time, McCarthy returned to Dr. Nobil with complaints of more acute pain that had purportedly been afflicting him for three weeks. During Dr. Nobil’s March 16, 2011 examination of McCarthy, McCarthy reported “mild to moderate discomfort” when he bent his back. An x-ray showed degenerative joint disease, prompting Dr. Nobil to note that “likely his recent MVA set off some ... underlying abnormalities.” Dr. Nobil forecast that McCarthy would continue to make progress if he continued with physical therapy, but that he might have “some residual discomfort.”
On May 27, 2011, McCarthy returned to Dr. Nobil with complaints of a sore neck. Contemporaneous physician notes from this visit indicate that McCarthy’s pain from soreness and stiffness registered “up to a 5 (out of] 10" on bad days, with good and bad days occurring in equal measure. The notes further reflect that McCarthy complained of ”an occasional] sharp pain in the left side of the neck," but Dr. Nobil assessed his condition as “a little better overall than two months ago.”
Dr. Nobil’s notes from his May 27 examination further observed that McCarthy was continuing “to make slow but steady improvement,” and that he was “much better than he was back in December.” Dr. Nobil recorded that McCarthy’s “symptoms are now *558 low grade,” but that it “remains uncertain whether he will have some low-grade chronic discomfort” going forward.
On June 27, 2011, and despite the encouraging observations that had been registered the previous month by his primary care doctor, McCarthy met with Dr. Richard M. Ozuna, a neurologist at Sports Medicine North in Peabody, Massachusetts. At that time, Dr. Ozuna’s historical notes state that, since his automobile accident, McCarthy “has had an increasing neck pain as well as numbness on the right cheek down the right side of his neck into the shoulder and down his arm to his elbow ...” Dr. Ozuna’s notes further state that, while McCarthy was “in no apparent distress,” he was “now over six months out from his injury with no significant improvement.” Dr. Ozuna referred McCarthy for an MRI of his cervical spine.
On July 18, 2011, McCarthy was again seen by Dr. Ozuna at Sports Medicine North. On this occasion, Dr. Ozuna diagnosed McCarthy with “neck pain, degenerative disc disease, right upper extremity numbness and paresthesias, and foraminal stenosis.” In his physical examination, however, Dr. Ozuna noted that McCarthy displayed a “full range of motion of his neck with minimal discomfort.” Dr. Ozuna suggested cortisone shots as a treatment option for those symptoms that continued to bother McCarthy; but McCarthy responded that “(hje [was] at this point comfortable •with his degree of pain,” which he described as “minimal.”
On August 26, 2011, McCarthy saw his primary care physician for a follow-up visit regarding his neck. At that time, Dr. Nobil recorded that McCarthy’s “pain is fairly minimal” and “no longer daily” in its occurrence. Dr. Nobil further observed that, because “[h]is symptoms had become fairly minimal now,” he did not “want to proceed -with cortisone injections as he is not bothered that much by this anymore.”
On September 5, 2011, McCarthy received treatment from Dr. Anthony Spartos, a colleague of Dr. Nobil at Family Doctors. At that time, McCarthy presented with what he described as “excruciating neck pain” that had stricken him the prior evening; and, suggesting that this pain might not be related to his automobile accident, McCarthy stated to Dr. Spartos that he thought it might be a nerve problem. Dr. Spartos prescribed pain medication to relieve McCarthy’s symptoms.
McCarthy returned to Family Doctors two days later, on September 7, 2011, and on this occasion saw Dr. Nobil. McCarthy complained that he felt soreness in his left shoulder and pain throughout his neck. McCarthy further reported that his neck rotation was limited, and that this made it hard to drive. Dr. Nobil’s notes state that “[i]f [McCarthy] not having significant improvement in the next few days he will likely need to reinstitute[ ] a course of physical therapy... He will let me know...”
The evidence at trial was that McCarthy did not return to Family Doctors to address his symptoms after September 7, 2011. He consulted neither Dr. Nobil nor Dr. Spartos. McCarthy likewise pursued no further treatment at Sports Medicine North; nor did he receive additional therapy at Spaulding Hospital (or anywhere else) following his September 7, 2011 visit with Dr. Nobil. In these circumstances, the Court finds that McCarthy’s pain symptoms — intermittent and significantly diminished as they were — had by this time improved to a low-grade level where McCarthy was able to manage them without substantial discomfort. McCarthy’s history reflects a patient who had no hesitation pursuing medical treatment to address pain at even mild levels, a fact lending added significance to McCarthy’s cessation of such interventions after the early fall of 2011. It is thus the finding of the Court that any injuries to McCarthy caused by his December 2010 automobile accident were transitory rather than permanent in nature, and in all events not materially painful or disabling to the plaintiff after September 7, 2011.
McCarthy’s medical bills incurred on account of his automobile accident totaled $5,183.00. McCarthy received $4,268.50 in Personal Injury Protection benefits from his insurer.
The Parties’ Settlement Negotiations
On November 21, 2011, counsel for McCarthy, having at this point provided Safety with records of most of McCarthy’s medical treatments and related bills, tendered a demand for settlement in the amount of $100,000 (the coverage limit of Weiner’s liability policy). Safety responded to this demand on November 30, 2011 -with a written offer to settle McCarthy’s personal injury claim for $2,500.00.
On February 21, 2012, and having in the interim received both a Chapter 93A demand letter[1] and additional medical records for McCarthy, Safety increased its settlement offer to $3,600.00. At that time, Safely invited McCarthy to submit additional medical records to support his claim. On May 23, 2012, after receiving notes from McCarthy’s two September 2011 physician visits and a reduced demand of $90,000.00, Safety increased its settlement offer to McCarthy to $5,900.00. The record at trial disclosed neither the submission of additional medical information by McCarthy to buttress his claim, nor the tendering of any further reduction in his settlement demand to Safety.
Safety’s Liability Assessment and Settlement Calculus
At trial, Safety’s Senior Claims Adjuster, Kara Smolinsky, testified credibly to the fact that at no time did the insurer deny that it was liable in negligence for any symptoms caused by the subject automobile accident, even if these symptoms represented an aggravation of a pre-existing condition. Ms. Smolinsky, however, explained Safety’s admittedly modest approach to settlement of the tort claim as a reflection of *559 the evolving evidence that McCarthy’s soft tissue injuries had substantially improved, were mild (or “low-grade”) in nature, and had not necessitated treatment after September 7, 2011.
Ms. Smolinsky further testified that she applied Safety’s standard valuation metrics to mitigated injuries of this nature, crediting McCarthy with between $75 and $250 for each week of documented discomfort following his December 2010 automobile accident. Ms. Smolinsky testified that she authorized increases in Safety's settlement offers as and to the extent McCarthy submitted corroborating medical documentation in support of his claim, and adjusted the compensatory pain rates reflected in these offers based on the substance of the medical records and in accordance with her many years’ experience as an insurance adjuster. The Court credits this testimony, which was neither impeached nor contradicted at trial.
Utilizing this methodology, Ms. Smolinsky explained that Safety had determined that soft tissue injuries of low-grade pain and limited duration warranted no more than the $5,900.00 the insurer had ultimately tendered to McCarthy. Safety had placed three increasing settlement numbers on the table since McCarthy had made his initial demand of $100,000.00 back in November 2011, in each instance doing so promptly after McCarthy had submitted additional medical evidence to substantiate his claim. In the process, Safety more than doubled its offer from first proposal to last. McCarthy, by contrast, had waited nearly a year to make his initial demand that Safety settle his clam (at the limits of its policy), and thereafter had moved just $10,000.00 (a 10% reduction) in the direction of compromise. In these circumstances, Ms. Smolinsky testified that Safety elected not to increase its $5,900.00 settlement offer further.
The Liability Trial
On July 17, 2014, following a three-day trial, a Suffolk County jury returned a verdict in favor of McCarthy on the sole count of his negligence complaint against Weiner. After deducting received Personal Injury Protection benefits as required by law, McCarthy’s recovery was $16,522.50. Neither party challenged the verdict as to liability or damages in post-trial motions.
RULINGS OF LAW
The law in regard to an insurer’s obligation to settle liability claims is well established in Massachusetts. G.L.c. 93A, §2(a) states that “unfair or deceptive acts or practices in the conduct of any trade or commerce are hereby declared unlawful.” G.L.c. 176D, §3, in turn, prohibits “unfair or deceptive acts or practices in the business of insurance, including, in subsection 9(f), the failure ”to effect prompt, fair and equitable settlements of claims in which liability has become reasonably clear." The SJC has declared that “the former statute incorporates the latter” and, therefore, an insurer that fails “to effectuate a prompt, fair and equitable settlement of claims in which liability has become reasonably clear, by definition, has violated the prohibitions in [Chapter 93A] against the commission of unfair or deceptive acts or practices.” Bobick v. U.S. Fidelity & Guaranty Trust, 439 Mass. 652, 659 (2003) (quotations omitted). Taken together, Chapters 93A and 176D “require an insurer . . . promptly to put a fair and reasonable offer on the table when liability and damages become clear, either within the thirty-day period set forth in G.L.c. 93A, §9(3), or as soon thereafter as liability and damages make themselves apparent.” Hopkins v. Liberty Mutual Ins. Co., 434 Mass. 556, 566 (2001); R.W. Granger & Sons v. J&S Insulation, 435 Mass. 66, 72-78 (2001). The standard for determining the adequacy of an insurer’s response to a demand for relief under Chapter 93A is “whether, in the circumstances, and in light of the complainant’s demands, the offer is reasonable.” Clegg v. Butler, 424 Mass. 413, 420 (1997). Accord Bobick, 439 Mass. at 659.
In the case at bar, both the documentary and testimonial evidence make clear that, while Safety accepted the premise that its insured was at fault in her automobile accident with McCarthy, there remained a substantial and unresolved question as to the true extent of plaintiffs injuries and, with that, disagreement as to the appropriate amount of damages sustained. McCarthy had, of course, received intermittent medical treatment for soreness and stiffness in his neck during the ten-month period following the accident, and his counsel took the position — both in his demand correspondence and during argument at trial — that his pain was disabling and permanent. However, contrary evidence permitted the inference, and Safety’s claims adjuster supportably determined, that McCarthy’s symptoms were in the nature of discomfort rather than pain, and in all events had mitigated to the point where they were so mild as to warrant no medical treatment at all after September 7, 2011. The Court credits this evidence.
Thus persuaded that McCarthy’s personal injury damages were not clear to Safety either at or following the time when plaintiffs Chapter 93A demand letter was served upon the insurer, the Court must consider the other circumstances contextualizing its settlement offers. (It is, of course, well established that the relevant inquiry in this regard is whether the insurer reasonably believed that its insured’s liability with respect to damages was not clear. See O’Leary-Alison v. Metropolitan Prop. & Cas. Ins. Co., 52 Mass.App.Ct. 214, 217 (2001); Bolden v. O’Connor Café of Worcester, 50 Mass.App.Ct. 56, 66-67 (2000).) Speaking to these circumstances of context, the SJC has explained that “the reasonableness of an insurer’s response is to be considered in the light of the situation as a whole.” Bobick, 439 Mass. at 662. “Negotiating a settlement, particularly when the damages are unliquidated, is, to *560 an extent, a legitimate bargaining process. The statute [G.L.c. 176D, §3(9)] does not call for a defendant’s final offer, and experienced negotiators do not expect it or take seriously a representation that it is.” Forucci v. U.S. Fiduciary & Guaranty Co., 1 F.3d 1, 2 (1st Cir. 1993). All the law requires is that an insurer extend a reasonable offer of settlement — and thereby participate in good faith in the bargaining process — once the matter of liability and damages has become clear to it. Bobick, id. at 662; Parker v. D’Avolio, 40 Mass.App.Ct. 394, 395 (1996) (‘The defendants bore the burden of proof that their settlement offer was reasonable and made in good faith in light of the demand and attendant circumstances”).
In the present case, the Court concludes that Safety’s claims adjuster made a reasonable assessment that McCarthy’s claimed soft tissue injuries fell at the veiy low end of the severity spectrum, and were neither significantly disabling in effect nor permanent in their nature. There was ample evidence in the medical records (even if contradicted in isolated places) to support this determination, buttressed by the fact that there was no evidence of any continuing need for medical treatment of McCarthy after September 7, 2011. With the evidence making clear that McCarthy knew his way to the doctor’s office when he was experiencing even modest levels of physical discomfort, the absence of any medical intervention from the fall of 2011 forward persuades the Court that Safety was well within its warrant to conclude that McCarthy’s condition had been substantially if not completely corrected.
The plaintiffs injury so assessed, Safety’s claims adjuster testified, credibly, that she applied valuation math that is conventional in the insurance industry to arrive at her offers to settle McCarthy’s claim. Thereby crediting McCarthy with between $75 and $250 for each week of documented discomfort following his automobile accident, and increasing its offer as McCarthy submitted additional medical records to substantiate the extent and duration of his injuries, Safety ultimately extended plaintiff a $5,900.00 settlement offer.[2] Although the amount of money so tendered may appear modest in the larger scheme of tort settlements, the Court finds that it falls comfortably within the range of reasonableness under the circumstances of this case.
Reinforcing the overall fairness of Safety’s settlement posture with McCarthy are three important facts adduced at trial. First, Safety extended its offer in the context of a claimant who had waited nearly a year after surfacing to the insurer post-accident to make his first demand (at policy limit), and then had waited fully three months before responding in kind to the insurer’s offer. Safety, by contrast, tendered three different settlement offers, each coming close on the heels of its receipt of updated medical information. Such alacrity in negotiation, particularly when confronting an adversary displaying the opposite propensity, is a hallmark of good faith settlement practice and recognized as such in the “promptness]” provision of G.L.c. 176D, §3(9)(f). See Parker v. D’Avolio, 40 Mass.App.Ct. 394, 403 (1996).
Second, the Court observes that Safety had previously bid against itself, raising its settlement offer two successive times with no intervening counter-demand by McCarthy. By the time Safety conveyed what would be its final settlement proposal, it had more than doubled the economics of its initial offer in a span of less than six months. McCarthy, by contrast, had reduced his settlement demand by just 10% during that same period of time, continuing to hover near the insurer’s policy limit and showing no signs (at least by action) of a readiness to negotiate further. These circumstances lend further reasonableness to Safety’s decision to keep its own offer at the lower end of the settlement spectrum.
Third, and perhaps most tellingly, the actual results of the McCarthy/Weiner liability trial amply support the conclusion that Safety’s settlement offers traveled in an orbit of fairness in this case. The jury that evaluated plaintiffs injuries (and having heard more extensive evidence concerning them than anything Safety was able to access prior to the trial) awarded McCarthy just $16,522.50 net of PIP medical benefits. This is an amount of money not substantially greater than what Safety had offered McCarthy three years earlier; and, in all events, the roughly $10,000 delta between the insurer’s offer and the trier of fact’s ultimate award strongly suggests that the jury evaluated the extent of plaintiffs injuries in a manner more closely approximating Safety’s assessment than McCarthy’s. As the SJC has stated:
It is particularly significant that the offer extended by [the insurer] and rejected by the plaintiff was only $10,000 less than the principal amount assessed by the juiy against [the insurer]. To be sure, a jury’s verdict is not always predictable and may not constitute in all circumstances a definitive measure of reasonableness. Nevertheless, in circumstances, as here, when an offer timely extended is not substantially less than the amount ultimately determined by a jury to be the proper measure of damages, and in the absence of any evidence to the contrary, a thoughtful fact finder could reach but one conclusion, that the offer in question was reasonable."
Bobick, 439 Mass. at 662. Accord Broaddus v. Mass. W. Ins. Co., 18 Mass. L. Rptr. 552, 2004 Mass.Super. LEXIS 539, at *7 (Mass.Super.Ct. Nov. 18, 2014) (Brassard, J.) (‘The reasonableness of this offer [$20,000.00] is reinforced by viewing it through the prism of the jury’s verdict of $35,000. Although a judge deciding a c. 93A case is not bound by the findings of the jury in the underlying action, the verdict of the jury validates the reasonableness of the insurer’s position *561 at the time of the mediation and its subsequent decision to present an initial offer of $20,000.00”).
At trial before the undersigned, counsel for McCarthy insisted that the weekly pain and suffering multipliers utilized by Ms. Smolinsky in her calculation of Safety’s settlement offers were too stingy, and that a $5,900.00 offer to settle damage claims like McCarthy’s was unreasonable as a matter of law under Chapters 93A and 176D. What is lacking, however, is any evidence (expert or otherwise) that the methodology applied by Safety in this case was anything other than industiy-normátive and appropriate. See, e.g., Bithoney v. Pilgrim Ins. Co., 20 Mass. L. Rptr. 372, 2006 Mass.Super. LEXIS 1, at * 7 (Mass.Super.Ct. Jan. 4, 2006) (Troy, J.). The Court has no doubt of the sincerity with which plaintiffs counsel believes his client deserved a more sizeable offer from this insurer; and, notwithstanding the validation of reasonableness supplied by the jury verdict, it may even be the case that Safely substantially undervalued McCarthy’s personal injuries. But, as noted ante, it is the reasonableness of Safety’s beliefs (rather than the plaintiffs) which defines the statutoiy test; and the law has long been clear that “[a]n insurer’s good faith, but mistaken, valuation of damages does not constitute a violation of c. 176D.” O’Leary-Alison v. Metropolitan Prop. & Cas. Ins. Co., 52 Mass.App.Ct. 214, 218 (2001); accord Pagliarulo v. Arbella Mut. Ins. Co., 2008 Mass.App.Div. LEXIS 20, at *6 (Mass.App.Div. Feb. 26,2008) (same). Even a very significant undervaluing of a plaintiffs claim will not trigger liability under Chapter 176D or Chapter 93A absent evidence that the insurer “acted deliberately to derail the settlement process.” Parker v. D’Avolio, 40 Mass.App.Ct. at 395 (1996) (defendant’s offer of $25.00 to plaintiff who subsequently obtained verdict of $1,250,000.00 held to be in good faith and not a violation of Chapter 93A). See also O’Leary-Alison, 52 Mass.App.Ct. at 218 (given the “equivocal medical evidence” supporting plaintiffs claim, “it was not error for the judge to conclude that [the insurer’s] offers of settlement were reasonable and made in good faith” — this despite the fact that the insurer offered just $20,000 on a claim where the jury awarded $125,000).
Here, the evidence persuades the Court that Safety tendered offers of settlement to McCarthy that were both reasonable in amount and based on a fair assessment of the medical records available to it in real time. Beyond his own subjective insistence that these offers were too low, McCarthy offers nothing that would even permit a finding that the actions of Safety represented an effort to thwart rather than promote the settlement of his claim. The Court will make no such finding on this record.
CONCLUSION AND ORDER
For the reasons set forth hereinabove, the plaintiff has failed to establish a violation of either G.L.c. 93A or G.L.c. 176D. Judgment shall enter dismissing the plaintiffs claims against defendant Safety Insurance Company in their entirety.

 This letter renewed McCarthy’s demand that Safeiy settle his claim at the policy limit level of $100,000.00.

 The fact that Safety raised its initial offer incrementally suggests that the insurer reasonably recognized a need to be responsive through compensation to evolving evidence concerning McCarthy’s injuries. It does not necessarily indicate that the full extent of plaintiffs damages had become clear, and may in fact suggest the opposite.