RLI INSURANCE COMPANY, Plaintiff,

v.

GENERAL STAR INDEMNITY COMPANY, Defendant.

No. CIV. A. 95–11390–REK.

United States District Court, D. Massachusetts.

Feb. 25, 1998.

**142**

Peter C. Netburn, Peabody & Arnold, Peter G. Hermes, Hermes, Netburn, Sommerville & O'Connor, Boston, MA, for Plaintiff.

Cynthia J. Cohen, James L. Polianites, Meehan, Boyle & Cohen, P.C., Boston, MA, for Defendant.

Opinion

KEETON, District Judge.

## I.  Background Facts

On July 3, 1992, eight-year-old Christy Gorham, while in the company of her mother, Robin Gorham, fell "20–30" feet to a hard surface from an upper level of a stairwell of an inner-city multiple-unit housing complex (the "premises"), also referred to in a stipulation filed in the form of "Joint Findings of Fact and Conclusions of Law" (Docket No. 56) as an "apartment building located at 176 Seaver Street, Roxbury, Massachusetts." Docket No. 56, Joint Finding 6. "As a result of the fall, Christy Gorham suffered a fractured skull, a fractured bone under her eye, a fractured jaw with subdural hematoma and was hospitalized in the Boston City Hospital approximately two weeks." Joint Finding 7. I find by a preponderance of the evidence that the fall was a legal cause of permanent brain damage and permanent partially disabling injuries to Christy Gorham.

The owner of the "premises" was a private entity, identified as one among the entities owning the "Benchmark Properties." The principal one among these entities was identified at the time as "Benchmark Properties Corp."

Benchmark Properties Corp. had in effect at the time of Christy's fall an occurrence policy of liability insurance, Commercial General Liability Policy No. IMG–190081, issued by General Star Indemnity Company ("General Star"), providing applicable coverage for liability imposed by law not in excess of $1,000,000.

Before Christy's fall, General Star had arranged with Alexander Reinsurance Intermediaries ("ARI") for reinsurance attaching "above $250,000." Joint Finding 10. ARI is not a party to this case, and no issue is before this court regarding rights and responsibilities as between General Star and its reinsurer, ARI.

At the time of Christy's injury, plaintiff RLI Insurance Company ("RLI") had in effect an applicable policy, Umbrella Liability Policy No. OUL–015489, providing tort liability insurance, identifying Blue Hill Housing Limited (one of the Benchmark entities) as the named insured, and providing $4,000,000 of umbrella coverage per occurrence above the primary coverage under the General Star policy.

I find by a preponderance of the evidence that representatives of General Star who were involved in investigating and otherwise handling the Gorham claim against General Star's insureds were not aware of the RLI umbrella coverage before May of 1994.

I find by a preponderance of the evidence that by means other than through General Star, RLI became aware of the Gorham claim and assigned to Carma Slaymaker responsibility for that claim. On May 18, 1994, Slaymaker had a telephone conversation with General Star's claims examiner, Claude A. Ronzitti, in which Ronzitti made statements, of content partially disputed, about the status of the Gorham claim and General Star's investigation and handling of it. Joint Finding 66.

For reasons to be examined in this opinion, the Gorham claim was not settled within General Star's policy limit of $1,000,000. In September 1994, approximately 21 months after Christy's injury, General Star notified counsel for the Gorhams that it acknowledged liability for and would pay its policy

limit of $1,000,000. "On or about January 25, 1995, RLI paid $1,000,000 of its umbrella policy limits as part of a total $2,000,000 settlement of the Gorham action." Joint Finding 132.

The present case is a civil action filed in this court by RLI as plaintiff to recover from General Star $1,000,000 in compensatory damages, together with attorneys fees and multiple damages under various state statutory and common-law claims. This court has jurisdiction by reason of diversity of citizenship.

The six-day nonjury trial in this case commenced in December 1997 and ended, except for the filing of post-trial submissions, on February 3, 1998.

## II.  The Evolving Nature of Law Applicable to Key Issues in This Case

Very few genuine disputes of fact are even potentially material to the outcome of this case. The applicable law, on the other hand, is subject to dispute in several potentially decisive respects, primarily because developments both outside and inside the legal system during the decades since mid-century have led to an evolution of legal doctrine regarding liability insurance relationships that is still ongoing.

■ The law governing this case is primarily state common law. Each state's decisions in an area of evolving law tend to be influenced substantially by those of other states. When a federal court must decide a dispute about applicable state law, in order to decide the outcome of a pending case, and decisions of that state do not answer the precise question in dispute, precedents of other states are among the sources of aid in predicting the resolution most likely in that state. *See, e.g., Mangla v. Brown University,* 135 F.3d 80, 84–85 (1st Cir.1998) (citing *Lyons v. Salve Regina College,* 565 F.2d 200, 202 (1st Cir.1977), *cert. denied,* 435 U.S. 971, 98 S.Ct. 1611, 56 L.Ed.2d 62 (1978)).

■ Yet, it is ordinarily inappropriate for a federal court to predict "trailblazing" decisions of state courts, even when an academic commentator's reasoned analysis of the evolution of legal doctrine might support such a prediction. *Ed Peters Jewelry Co. v. C & J Jewelry Co.,* 124 F.3d 252, 276 (1st Cir.1997); *Carlton v. Worcester Ins. Co.,* 923 F.2d 1, 3 (1st Cir.1991) (citing other First Circuit decisions).

The more appropriate method of assuring a correct outcome on the merits in the particular case is certification of unsettled questions of state law to the state's highest court, if that procedure has been authorized. The authority does exist in this case. Even so, ordinarily a federal trial court, before considering certification, should take special care not only to resolve all potentially material factual and evaluative questions but as well to determine what the outcome of the case must be unless the state court of last resort chooses to overrule or modify its decisions most nearly in point with respect to the precise issues presented by the pending case. *See Canal Electric Co. v. Westinghouse Electric Co.,* 756 F.Supp. 620, 622 (D.Mass.1991) (court recognized that certification had been premature because it failed to make factual determinations that were material to outcome).

The precise issues presented by this case concern two analytically separable sets of legal-factual issues. **First.** What is the standard of performance by which a primary liability insurer's acts and omissions with respect to a tort claim (or potential tort claim) against one or more of its insureds, including possible settlement, are to be judged? **Second.** What is the scope of legal accountability for sub-standard conduct? Ordinarily answers to issues regarding scope of accountability under law are reasoned as decisions about duty, breach, ties or connections between risk and result, and cause. Issues regarding cause may be reasoned as matters concerning actual cause (or cause-in-fact) or as matters concerning other aspects of the broader concept of legal cause (or proximate cause).

The answers to subsidiary questions within each of the two analytically separable sets of issues may depend upon interrelated conflicting interests that grow more complex with changes in liability insurance marketing

practices and with developments outside the liability insurance market to which that market responds. The persons and entities whose interests clash are currently a larger and more diverse group than those involved a few years or a few decades ago. At present, they include (i) the primary liability insurer, (ii) each of its one or more insureds against whom a tort claim has been or may be made, (iii) any insurer with whom the primary liability insurer has some reinsurance arrangement (a matter not at issue in this case, even though in fact the primary liability insurer did have reinsurance in effect at the time of Christy Gorham's injury), (iv) any excess or umbrella liability insurer with whom any insured of the primary liability insurer had applicable coverage in effect, (v) any expert in law, or in liability insurance practices, or both, engaged as a consultant, (vi) any expert in law whom a party proffers as either a fact witness or an opinion witness (regardless of how the courts resolve issues of admissibility of proffered opinions), (vii) any expert in liability insurance marketing practices or claims-handling practices whom a party proffers as a witness, (vii) any attorney engaged by a claimant, (viii) any attorney engaged by a primary liability insurer to represent an insured in settlement or defense, and (ix) any attorney engaged by an excess or umbrella insurer to represent that insurer, or another interested person or entity, or both.

The evolution of relevant legal doctrine, ongoing at modest pace since mid-century and at an accelerated pace more recently, extends also to professional responsibility issues. *See generally* Restatement (Third) of the Law Governing Lawyers (Tentative Draft No. 8, 1997).

This pervasive evolution of relevant legal doctrine is manifested primarily in decisional law, but legislation has contributed significantly. In Massachusetts, unfair settlement practices legislation imposes new responsibilities on liability insurers as well as others. For example, Mass. Gen. L. ch. 176D, § 3(9)(f), and amendments of acts initially conceived as consumer protection legislation, such as Mass. Gen. L. ch. 93A, reach some of the issues in this case. Inevitably, disputes over the meaning and effect of statutory provisions must be resolved by decisions of courts in particular cases, and those decisions, as precedents, become additions to the evolution of governing law. An example appears in *Clegg v. Butler*, 424 Mass. 413, 676 N.E.2d 1134 (1997), the most recent of the decisions of the Supreme Judicial Court of Massachusetts to which this court looks for guidance in this case.

As a major party whose interests were at issue in *Clegg v. Butler*, Utica Mutual presented an argument about the meaning of subsections 3(9)(f) and (g), to which the SJC responded in the following way:

> Perhaps attempting to buttress its argument that third-party claimants are not protected under c. 176D, s 3(9), Utica notes that subsection (g) creates no rights in persons other than the insured, [citation omitted], and observes that other clauses can be read the same way. We note, however, that subsection (g), by its text, is explicitly restricted to insureds. There is no such limiting language contained in subsection (f), a clause which we read to apply to any party whose legal interests might be adversely affected by an insurer's failure to effectuate settlement where liability is reasonably clear. . . .

424 Mass. at 419 n. 5, 676 N.E.2d at 1139 n. 5. I return in Part V of this opinion to the subject of persons and entities protected by the evolving law of liability insurance relationships.

Also within the complex array of legal-factual issues potentially material to the outcome in this case is the body of precedent and practice bearing upon judicial consideration of a proposed settlement of a claim for permanent injury to a minor claimant.

This opinion turns first to factual and legal issues bearing on the standard of performance.

### III. The Standard for Judging Performance of a Primary Liability Insurer

The Supreme Judicial Court of the Commonwealth of Massachusetts contributed to the early stages of the evolution of legal doctrine, nationally, bearing on a primary liability insurer's responsibility regarding

settlement. Important aspects of this subject were addressed in *Abrams v. Factory Mut. Liab. Ins. Co.*, 298 Mass. 141, 10 N.E.2d 82 (1937). In February 1994, while the Gorham claim that is the subject of this litigation was pending and yet to be settled, many unresolved issues of Massachusetts law, including issues noted but not decided in *Abrams*, were firmly and clearly answered in *Hartford Cas. Ins. Co. v. New Hampshire Ins. Co.*, 417 Mass. 115, 628 N.E.2d 14 (1994).

> This case prompts us to consider, for the first time in more than forty-five years, the nature of the duty that a primary insurer owes to its policyholder (and, therefore, to a subrogated excess insurer) with respect to the settlement of a third-party claim. A jury returned a verdict in a tort action against an insured substantially in excess of the $500,000 primary coverage provided by the defendant, The New Hampshire Insurance Company. The plaintiff, The Hartford Casualty Insurance Company, which provided excess coverage of the claim, paid $1,500,000 to satisfy its insured's and its obligation in excess of primary coverage.

> In this action, Hartford, subrogated to its insured's rights against New Hampshire, argues that New Hampshire is liable for Hartford's excess loss payment because New Hampshire improperly failed to settle the claim within the limits of the primary coverage. . . .

417 Mass. at 116, 628 N.E.2d at 15.

The questions directly answered by the SJC were in some important respects different from the questions presented in the present litigation because jury findings rejected both Hartford's claim that New Hampshire acted in bad faith in failing to settle within the limits of the primary coverage and Hartford's claim that New Hampshire was negligent in failing to settle within the limits of the primary coverage. Thus, after the SJC determined in Hartford's appeal that the judgment of the trial court for New Hampshire, on the verdict, should be affirmed on the negligence ground for a reason explained immediately below, it was not necessary for the SJC to decide whether it might have been affirmed also on the bad faith ground.

Included in the negligence claim before the SJC on appeal was a contention that New Hampshire was liable for "negligent handling of the defense of a covered claim" and also for "negligent handling of the subject of settlement." The SJC responded:

> When the *Abrams* case was decided, there was no G.L. c. 176D (1992 ed.) concerning unfair or deceptive acts or practices in the business of insurance, including unfair settlement practices (G.L. c. 176D, § 3(9)). [footnote omitted] One statutory unfair practice is the failure "to effectuate prompt, fair and equitable settlements of claims in which liability has become reasonably clear." § 3(9)(f). If, as is true, an insurer can be liable to a claimant for unfair claim settlement practices (see G.L. c. 93A, § 9 [1992 ed.], which imposes standards of reasonable care), an insurer should be likewise liable to its insured for negligence in the handling of the settlement of a claim against its insured.

*Hartford*, 417 Mass. at 120, 628 N.E.2d at 17.

Standing alone, this passage might be understood as adopting a straightforward and unqualified negligence standard as the basis for judging the choice to settle or not to settle at a particular figure within policy limits for which the case could have been settled, as well as all other aspects of "the handling of the settlement of a claim against its insured." But this passage is preceded by a passage distinguishing between the standard of performance applying to an insurer's duty "to carry out its promise to defend (contract)" (citing *Abrams* ) and the standard of performance applying to an insurer's duty regarding the decision to settle or not to settle. Almost invariably the liability insurance contracts in cases coming before the courts have included a contractual promise of the insurer to defend on behalf of the insured, but no promise regarding settlement, and instead a contractual provision permitting the insurer to make a settlement of the third-party claim against the insured. *See generally* Robert E. Keeton, *Liability Insurance and Responsibility For Settlement*, 67 Harv. L.Rev. 1136, 1137–38 (1954) (citing *Abrams* among cases from other state and federal courts). The preceding passage

in the *Hartford* opinion observed that SJC opinions since the *Abrams* case had continued to recognize that the obligation of a liability insurer concerning settlement "is to act in good faith." *Hartford,* 417 Mass. at 118, 628 N.E.2d at 16.

The practical significance of the distinction is diminished by the likelihood that, as in *Hartford,* the jury will be persuaded to find both negligence and bad faith or else find neither negligence nor bad faith. The practical significance is diminished also by the adoption by many courts of "a dual standard requiring only good faith as to the **decision** regarding settlement but requiring also ordinary care in the investigation leading to such decision." Keeton, *supra,* at 1141 (citations omitted). The *Hartford* decision, though apparently holding back from outright elimination of the distinction, does still more than had been done previously to reduce its significance.

> The negligence standard by which the actions of an insurer concerning settlement will be tested hereafter will be in practice not significantly different from the good faith test that has been evolving in this Commonwealth.

417 Mass. at 121, 628 N.E.2d at 17–18.

■ Along with this added step in the evolution of the standard of performance to be used in deciding cases regarding a liability insurer's responsibility for settlement is another very significant pronouncement of the SJC explaining more precisely what it is an insured must prove to show a breach of the insurer's duty regarding settlement for which liability may be imposed.

> The test is not whether a reasonable insurer might have settled the case within the policy limits, but whether no reasonable insurer would have failed to settle the case within policy limits....

417 Mass. at 121, 628 N.E.2d at 18.

This matter is explored further in later parts of this opinion.

## IV. Risk and Result: Accountability for What?

Closely intertwined with the set of issues regarding the standard by which a primary liability insurer's conduct is to be judged is a set of issues about concepts of risk and result. Described another way, these intertwined issues concern the kind of risk analysis that is an essential part of a primary liability insurer's acceptable performance.

General Star called to the witness stand, as one of its expert witnesses, an exceptionally distinguished member of the trial bar of the Commonwealth of Massachusetts and this court, Michael Mone. His professional experience has extended to extensive involvement in counseling and representing either liability insurers or claimants against liability insurers of medical professionals, often in contexts in which a significant part of the need for advice and representation concerned potential liability of a primary professional liability insurer to an insured physician for paying on behalf of the physician that part of a large judgment, imposed on the physician by law, that is in excess of an applicable limit of liability insurance coverage. In response to questions on cross-examination by counsel for plaintiff RLI, Attorney Mone expressed the opinion that risk analysis is essentially the same type of analysis in all the varied kinds of cases involving claims or potential claims of liability of a primary insurer in excess of an applicable policy limit. The conclusions about nature and degree of risk of adverse outcomes from claims handling vary with circumstances and particulars of each case, but the need for and method of risk analysis is common and general. Also, appropriate risk analysis is even more critically important in cases of severe and permanent injury to a child, involving brain damage that is permanently disabling and creates a need for thinking about appropriate life-care arrangements in any settlement fashioned for a claim based on an injury that will leave an injured child unable to care for herself as she ages, and dependent solely on public benefits and private charity unless the settlement of the claim is structured to provide funding in later years for life care.

As finder of fact in this nonjury trial, I credit the expressed opinions about risk analysis described above. I find that an objectively suitable risk analysis in this case, performed initially at an early stage in conformity with the standard of performance ex-

plained in Part III of this opinion, and refined as more information about liability and severity of injury became available, would have identified this case much earlier than it was identified by General Star's claims-handling team as one requiring added steps of performance, beyond those that were taken, to conform with the standard of performance described in Part III of this opinion.

■ On the evidence before the court in this nonjury trial, I find that, if the standard explained in *Hartford* is determined finally to be applicable (a matter considered in Part V of this opinion, below), the standard was violated by General Star's failure to recognize, promptly after it received notice of the injury, that the Gorham claim required intensive and early attention to establishing a favorable relationship among General Star, its insured, and the Gorhams (or their attorney if they were already represented by counsel). Of course, no offer need be made that early, and indeed a precise offer that early would probably be inappropriate. But a liability insurance claims adjuster is not measuring up to the objective standard of performance defined by law if he is not aware of and giving reasonable attention to this need for prompt initiative to establish a favorable relationship within which the parties can develop and disclose by agreement, rather than through adversarial processes, information bearing upon liability, severity of injury, and likelihood of need for lifetime care for a person permanently brain-damaged in childhood.

If either the insured or the insurer behaves in a way likely to be interpreted by a claimant as a charge that the claim of injury is fraudulent, the stakes are raised and the likelihood of an ultimate settlement at or below the policy limit is reduced. If the insurer makes such a suggestion or intimation to a claimant's attorney, it is likely indeed that the attorney will pass it on to the claimant. Of course, the investigation must be thorough, so possible defenses on the merits are adequately explored. That must be accomplished, however, without needless provocation that impairs the relationship within which future negotiations may be conducted. The liability insurer's duties and rights are not confined to aggressive defense; they extend as well to responsibility for reasonably prompt and reasonably effective investigation that will enable the insurer to have an adequate basis for making a decision about settlement, even if that decision itself is to be judged by a good faith rather than a negligence standard.

The argument on behalf of General Star that a primary liability insurer is never obligated to make an offer at some precise figure before the claimants' attorney has disclosed medical information essential to analysis regarding severity and permanence of injury misses the point. A primary liability insurer would not be in compliance with an appropriate standard of performance if it took the position that it had a perfect excuse for doing nothing because the claimants' attorney was taking a hard-line position against voluntary disclosure of medical information unless the liability insurer would disclose information in its files bearing on liability. I do not find, on the record before me, that General Star in fact took such an extreme position. Although I find General Star's performance deficient, the deficiency was one of failure to act more expeditiously in its independent investigation about (i) how Christy had fared in the public school setting after her two-week hospitalization, (ii) what it could learn about Christy's pre-injury mental and social functioning through sources other than the claimants' attorneys, and (iii) whether it could work out some arrangement or accommodation with the claimants' attorney for a voluntary exchange of information short of unlimited access of either party to the other party's full file, including work product. A basic point stated here is that I conclude, as a matter of law, that if, as one might interpret General Star's position in a part of its argument before this court, General Star is asserting that it had a right to withhold work-product portions of its files while expecting Attorney Milne to make "full disclosure" and to cooperate fully to help General Star obtain what it wanted, that argument for legal rulings about obligations of disclosure and cooperation is tilted in General Star's favor and is without merit.

Also, the testimony of one or more of General Star's witnesses might be interpreted as expressing a position that Attorney Milne had promised "full cooperation" and that on a contractual or estoppel basis, or on some other theory, that promise somehow tilted in General Star's favor the legal rules otherwise applicable. To the extent that such a contention is being advanced by General Star, I conclude that it is without merit as a matter of law. The communications between Milne and General Star's representatives are not reasonably susceptible of interpretation as promises made without any implicit condition of very similar if not literally full cooperation by General Star. Moreover, such a contention, in any event, is not directly on point because it concerns an alleged understanding between the attorney for the Gorham claimants and General Star. The issue here concerns General Star's obligations to others.

The findings recited above, based primarily on crediting opinions expressed in the testimony of Attorney Mone, are reinforced by elements of the testimony of Attorney Coombs, whom RLI called as a witness. The Gorham claim first came to Attorney Coombs' attention before the present case was filed, and as a consequence of a long-term professional interest in claims of liability in excess of policy limits, generated not from the perspective of a trial lawyer handling such claims but more from the perspective of advisor, evaluator, consultant, or mediator. Not surprisingly, from that perspective, he viewed the Gorham claim as one with respect to which any reasonable primary liability insurer would have made "a reasonable offer" at an early stage of claims handling. In his testimony as a witness called in this case by RLI, he fixed the time for the offer as "no later than July 6, 1993." Although recognizing this view as one within the range of reason from his perspective and on the basis of the information and assumptions he recited in support of his view, I do not find by a preponderance of the evidence that no reasonable primary liability insurer would have failed to make a firm offer to settle at a figure within its applicable limit on or before that date.

The finding I make on the entire record of evidence proffered at this trial is a more measured finding about claims handling rather than a finding about an early firm offer at a precise figure. Also, it is a finding based on application of an objectively defined standard of performance as explained in Part III of this opinion.

I find by a preponderance of the evidence that no competent and experienced claims handler would have failed to recognize at a very early stage, long before sufficient information about both likelihood of liability and likelihood of exceptionally severe and permanent injury was known, that the Gorham claim was quite likely to be a claim with a settlement value in a range of which the low end exceeded General Star's applicable $1,000,000 limit of coverage.

Because of these findings and conclusions, the focus here must be on deciding whether General Star's performance measured up to its responsibility not to the Gorham claimants and their attorney but to General Star's own insured (and possibly to other interested persons and entities under rules of accountability to be considered in Part V).

## V. Accountability To Whom?

The settled law of Massachusetts leaves no doubt that the primary liability insurer is legally accountable to its insured for substandard performance in relation to the possibility of settling a claim within an applicable policy limit. *Hartford, supra.*

Indications are strong that this rule of legal accountability, or one closely similar to it, if not precisely the same, will be extended to an excess insurer, whose position and interest, as a pragmatic matter, are equally foreseeable and closely similar in other material respects. *Id.*

Is the position of RLI as an umbrella insurer materially different? Both legal and factual questions may need to be considered to reach a final determination regarding this matter.

I turn first to a legal issue. In the *Hartford* case, Hartford objected that the trial judge refused to instruct the jury, as Hartford requested, "that New Hampshire, as the primary insurer, had a direct duty of care to

Hartford as a known excess insurer." 417 Mass. at 124, 628 N.E.2d at 19. The SJC observed that "Hartford cites no substantial authority in support of the existence of a direct duty," *Id.* The SJC then added: "The absence of supporting citations is explicable. The general rule is that an excess insurer has a claim based on equitable subrogation but no right to a direct action against the primary insurer." *Id.* at n .7 (citations omitted). Declining, however, to declare that a claim that the primary carrier has a direct duty to an excess carrier could never be sustained, the SJC explained:

> New Hampshire's direct duty, if any, to Hartford would be no greater than New Hampshire's duty to its insured. [Citations omitted.] We need not decide whether a primary carrier ever could owe a direct duty to an excess carrier concerning the primary carrier's handling of its obligations to the insured because, if such a duty existed here, Hartford has not shown that it was prejudiced by the judge's refusal to instruct the jury on the subject.

417 Mass. at 124, 628 N.E.2d at 19. I conclude for like reasons that I need not predict whether RLI's contention that General Star owed RLI a direct duty would be sustained under Massachusetts law. Neither party to this case has proffered any persuasive argument of law or fact that answering this undecided question of law would make a difference in outcome of this case. The arguments for extending the protection available to an excess carrier under settled Massachusetts law one more step to give like protection to an umbrella carrier are neither more nor less persuasive when reasoned on grounds of direct duty than when reasoned on grounds of equitable subrogation.

In one respect I find a factual distinction, on the record before me, between the position of RLI and that ordinarily occupied by an excess carrier. The RLI umbrella coverage was not made known to the General Star representatives who were handling the Gorham claim before May 1994.

I conclude, however, that this factual distinction is not material to rulings of law with respect to General Star's legal accountability for consequences of its failure to measure up

to the standard of performance explained in earlier parts of this opinion. It is hardly a "trailblazing interpretation" of decisions of the Supreme Judicial Court of Massachusetts to understand them as entirely consistent with extending the accountability of a primary liability insurer to an umbrella carrier as well as an excess carrier. Thus, I conclude, as a matter of law, that if RLI's claim is supportable in all other respects, including the causal issues to be considered in Part VI, next below, it is not defeated simply because RLI is in the position of an umbrella carrier whose coverage was not disclosed to General Star's claims-handling representatives before May 1994.

## VI. Cause: Actual and Legal

■ The inquiry into causation issues commences appropriately with a passage from the *Hartford* opinion cited above and now repeated and expanded here.

> The test is not whether a reasonable insurer might have settled the case within the policy limits, but whether no reasonable insurer would have failed to settle the case within policy limits. This test requires the insured (or its excess insurer) to prove that the plaintiff in the underlying action would have settled the claim within the policy limits and that, assuming the insurer's unlimited exposure (that is, viewing the question from the point of view of the insured), no reasonable insurer would have refused to respond to the offer.

417 Mass. at 121, 628 N.E.2d 14.

This passage from the *Hartford* opinion speaks directly of a case in which the tort claimant makes an offer to settle within the primary liability insurer's applicable limit of coverage. Does it apply as well to a case in which no offer has been made but the primary liability insurer could have settled within its policy limit had its "handling" of the claim measured up to the prescribed standard of performance in investigation and other steps that would have enabled it to decide at a relatively early date that the claim was one of as to which "liability has become reasonably clear," Gen. L. ch. 176D, § 3(9)(f)?

General Star argues for a negative answer. I conclude, however, that even though an affirmative answer would be another evolutionary step beyond the explicit statement by the SJC quoted immediately above, interpreting *Hartford* and *Clegg* as supporting such a ruling is hardly a "trailblazing interpretation" of those opinions. I would make that prediction if it were dispositive in this case. In order to determine whether it would be dispositive, however, it is necessary to consider another issue, to which I now turn.

█ Will the record in this case support a finding, by a preponderance of the evidence, that General Star would have effected a settlement of the Gorham claim if General Star had acted prudently throughout its handling of the Gorham claim? As stated in *Hartford,* the test is not whether General Star might have done so, but whether no reasonable primary liability insurer would have failed to do so in the particular circumstances of the Gorham claim. One important consequence of taking this distinction into account is that, as finder of fact in this nonjury trial, I cannot find that General Star would have effected a settlement within its applicable limit of $1,000,000 unless I find by a preponderance of the evidence that not only would Attorney Milne and Robin Gorham have agreed to the settlement but also a guardian or other appropriate fiduciary authorized to speak for Christy would have agreed and the settlement would have been approved by a court of the Commonwealth, authorized to act in the matter.

Instead, I find by a preponderance of the evidence that by the time General Star, performing up to standard, could determine that liability with respect to the Gorham claim had become reasonably clear, the Gorhams and their attorney would have known the same thing and would also have known that Christy had sustained a permanently disabling brain injury, plainly making a settlement for as little as $1,000,000 too low to be accepted by them and too low to be approved by a court of the Commonwealth.

For these reasons, I find by a preponderance of the evidence that General Star's substandard performance in "handling" the Gor-

ham claim was neither a cause-in-fact nor a legal cause of RLI's expenditure of $1,000,000 in addition to the $1,000,000 contributed by General Star to settlement of the Gorham claim.

## VII. RLI'S Other Contentions

RLI contends that General Star's conduct violated Mass. Gen. L. chs. 93A and 176D, § 3(9). General Star responds to these contentions by asserting that RLI cannot recover for a violation of ch. 176D, § 3(9) because RLI has no private right of action to enforce that section in this court.

Chapter 176D, § 3(9) contains clauses describing acts and omissions that are forbidden as unfair or deceptive practices in the business of insurance. Subsection 3(9)(f) says that "failing to effectuate prompt, fair and equitable settlements of claims in which liability has become reasonably clear" is a violation of Chapter 176D. But Chapter 176D does not declare that any person or entity has a private right of action against an insurer who violates subsection 3(9). *Thorpe v. Mutual of Omaha Ins. Co.,* 984 F.2d 541, 544 (1st Cir.1993).

█ Chapter 93A does create a private right of action for consumers to recover for violations of Chapter 176D. This provision, however, explicitly declares that it does not apply to persons or entities engaged in "trade or commerce." They are not entitled to recover relief in a civil action based simply on a showing of a violation of 176D.

> Polaroid's claim that G.L. c. 93A, § 11, was violated by its primary insurers' violation of certain provisions of G.L. c. 176D, § 3, cl. 9, is of significance only to the extent that the alleged wrongful conduct was a violation of G.L. c. 93A, § 2 ("unfair or deceptive acts or practices"). A consumer asserting a claim under G .L. c. 93A, § 9, may recover for violations of G.L. c. 176D, § 3, cl. 9, without regard to whether the violation was unlawful under G.L. c. 93A, § 2, because of the explicit statement to that effect in § 9. Polaroid, however, asserts rights under G.L. 93A, § 11, as one engaged in trade or commerce, and § 11 does not grant an independent right to

recover for violations of G.L. c. 176D, § 3, cl. 9.

*Polaroid Corp. v. Travelers Indem. Co.*, 414 Mass. 747, 754, 610 N.E.2d 912, 917 (1993). *See also First State Ins. Co. v. Utica Mut. Ins. Co.*, 870 F.Supp. 1168, 1180 (D.Mass. 1994), *aff'd*, 78 F.3d 577 (1st Cir.1996) (excess insurer cannot sue primary insurer for a violation of Chapter 176D under Section 9 of Chapter 93A). Parties engaged in "trade or commerce", therefore, must sue under Section 11 of Chapter 93A and satisfy the elements of a claim based on an alleged unfair and deceptive practice under Section 2 of Chapter 93A. I find that RLI is a person engaged in trade or commerce for purposes of Chapter 93A.

For these reasons, I conclude that, as a matter of law, RLI may sue only under Section 11 of Chapter 93A for a violation of Section 2 of that chapter, and not under Section 9 of that chapter for a violation of Chapter 176D, § 3(9).

█ For RLI to recover under Section 11 of Chapter 93A, General Star's unfair or deceptive practice or failure to measure up to the standards of performance required under Section 2 of Chapter 93A must be both a "but for" cause (cause-in-fact) and a legal cause of the harm for which RLI seeks a remedy. *International Fidelity Ins. Co. v. Wilson*, 387 Mass. 841, 443 N.E.2d 1308, 1314 (1983), *cited in Farm Bureau Fed'n, Inc. v. Blue Cross of Massachusetts, Inc.*, 403 Mass. 722, 731, 532 N.E.2d 660, 665 (1989). Essential to this showing, for reasons explained in Part VI of this opinion, is a showing that, if General Star had measured up to the standards governing its conduct in claims handling, "the plaintiff in the underlying action would have settled the claim within the policy limits." *Hartford*, 417 Mass. at 121, 628 N.E.2d at 18.

I recognize that the scope of the applicable duty of General Star, whether merely coextensive with the duty under *Hartford* or instead reaching other conduct as well, may affect the type of proof of causation. For example, a breach of a duty under Section 2 of Chapter 93A, even if not a cause of failure to settle within policy limits because the case could never have been settled at a figure that low, might in appropriate circumstances be determined to be a cause of loss of an opportunity to settle sooner or at a lower figure above the primary insurer's limits.

In this case, however, RLI has not sought recovery on such a ground. RLI seeks to recover the "additional" $1 million that RLI alleges it paid, and not some intermediate figure.

For the reasons explained here and in Part VI of this opinion, I conclude that RLI has failed to proffer any evidence that would support a finding that General Star's conduct was a cause of loss suffered by RLI.

For these reasons, I conclude that, as a matter of law, RLI is not entitled to recover under Mass. Gen. L. chs. 93A and 176D.

## VIII. Reserved Rulings on the Admissibility of Evidence

During the trial, the court made numerous rulings receiving evidence over objection. Among these were rulings explicitly receiving evidence for limited purposes. For example, in many instances the court received evidence of an out-of-court statement not as proof of the truth of facts asserted in the statement but as evidence of what assertions of fact and reports of possibilities warranting further investigation had come to the attention of someone having a role in the claims-handling process (often referred to in colloquies during trial as "verbal act" evidence).

In addition, the court in numerous instances reserved rulings on objections to proffered evidence on the ground that it was not relevant, not material, or not having sufficient probative weight for any permissible purpose to outweigh other factors to be considered by the court under Federal Rule of Evidence 403.

Each of the matters on which the court reserved ruling is now determined to be moot. The court's findings of fact and evaluative determinations applying law to the factual circumstances of this case have been recited and explained throughout this opinion. In no instance has the court's decision depended in any degree on whether or not it should consider any of the challenge evidence.

152

Even if the challenged evidence could be taken as satisfying the threshold of relevance, in no instance was it of sufficient probative weight to affect the court's finding of fact or evaluative determination.

Examples that warrant particular notice arose during the testimony of two of RLI's witnesses: Attorney Chris A. Milne (who had represented the Gorhams) and Attorney William T. Corbett, Jr. Each of these witnesses was, in the court's view, highly qualified and professional. Their testimony, and the testimony at trial (and by deposition) of other attorney witnesses, was consistent with recently clarified ethical standards governing the testimony of an attorney as an expert in an area of the law when the attorney has some pre-existing attorney-client relationship with one of the parties. *See* ABA Comm. on Ethics and Professional Responsibility, Formal Op. 97–407 (1997) (discussing applicability of Model Rules to lawyer as testifying expert or consulting expert).

The central reason for which their testimony did not persuade the court to decide in favor of RLI's claim is that their testimony did not go to the issues that the court has determined to be decisive.

Attorney Milne's opinions that he had authority to make a settlement agreement with General Star that would bind his clients (including the injured minor claimant), without any condition of subsequent approval by Robin Gorham and subsequent approval by a court of the Commonwealth of Massachusetts, is very likely erroneous as a matter of law on the ground that if not approved by a court, after appropriate hearing, the settlement agreement would have been subject to being set aside by or on behalf of Christy Gorham when she attained majority, if not before that time. In any event, however, because of (1) the absence of explicit legal authority (statute or precedent) to support the stated opinion, (2) the existence of practices of courts in Massachusetts in requiring a showing of fairness of a settlement both in amount and in provisions for assurance of use of proceeds in a way consistent with a minor claimant's interests, and (3) circumstances of this case alerting representatives of each person and entity having an interest

in the handling of the Gorham claim, I find as a fact that it cannot correctly be stated that no competent and qualified primary liability insurer would have failed to make a settlement agreement with an attorney that was not unconditional (that is, not conditioned on subsequent approval by both Robin Gorham and a court). This finding of fact makes the disputable legal assertion of Attorney Milne as a witness (and RLI as a claimant) immaterial to the outcome of this case.

Similarly, if opinions expressed by Attorney Corbett are interpreted (as General Star's counsel argued) as saying that no reasonable insurer would have failed to interpret Attorney Milne's letter of July 1, 1993 as an offer to settle for less than $1,000,000, and respond with a firm offer to settle, I do not so find. Instead, I have made a somewhat more measured finding, consistent with Attorney Corbett's expressed opinion that good claims-handling practice required taking steps to keep open lines of communication and keep the relationship from deteriorating into hostility.

This more measured finding is so powerfully supported by the evidence as a whole in this case that I would not find otherwise regardless of how reserved objections to admissibility were decided.

### IX. The Final Decision in the Trial Court: Judgment or Certified Question?

On both factual and legal grounds, RLI disputes the court's determination that, because plaintiff has not succeeded in establishing that defendant's substandard performance in its "handling" of the Gorham claim was a cause of plaintiff's claimed loss, the appropriate final disposition of this case is judgment for defendant. In these circumstances, if either party proposes that this court certify a question or questions of unsettled law to the Supreme Judicial Court, and wishes to submit a precisely framed and explained proposal for certification, that proposal will be considered. Absent such a proposal, submitted on or before March 27, 1998, the court expects to direct the Clerk to enter on a separate document a Final Judgment

for defendant on the findings and conclusions of this court, as explained in this opinion.