Patricia S. SAVOY, Plaintiff,

v.

RICHARD A. CARRIER TRUCKING, INC., Peter E. Johnson, Sr., and United States Fidelity and Guaranty Company, Defendants.

CIV.A. No. 97–30006–MAP.

United States District Court,
D. Massachusetts.

March 19, 1998.

John G. Bagley, Egan, Flanagan & Cohen, PC, Springfield, MA, for Richard A. Carrier Trucking, Inc., Peter E. Johnson, Sr.

Richard F. Faille, Law Offices of Faille, Higham & Daniels, Springfield, MA, for United States Fidelity & Guaranty Company.

### MEMORANDUM AND ORDER WITH REGARD TO DEFENDANT'S MOTION TO COMPEL (Docket No. 64)

NEIMAN, United States Magistrate Judge.

Defendant United States Fidelity & Guaranty Company ("Fidelity") has moved that J. Michael Scully ("Scully"), one of Patricia S. Savoy ("Plaintiff")'s attorneys, be compelled to answer certain questions propounded to him during his deposition. Fidelity's motion is made in conjunction with a motion to disqualify both Scully and Attorney Francis D. Dibble, Jr. ("Dibble"), Scully's co-counsel. For the following reasons and within the limits of guidance which the court provides, Fidelity's motion is allowed.

As indicated in the court's contemporaneous memorandum and order with respect to Fidelity's motion to disqualify, the only remaining issue in this case is Plaintiff's claim against Fidelity under M.G.L. chs. 176D and 93A. M.G.L. ch. 176D § 3(9)(f) makes it an unfair and deceptive practice for an insurance company to "fail[ ] to effectuate prompt, fair, and equitable settlements of claims in which liability has become reasonably clear." Under M.G.L. ch. 93A, a person injured by such a practice may claim relief, including up to three times the amount of actual damages if the practice was wilful or knowing. In combination, these statutory provisions serve to compel insurance companies to settle well-founded claims promptly and fairly, rather than to "wear out the claimant by unduly delaying settlement when liability is clear." *Miller v. Risk Management Found. of the Harvard Med. Inst., Inc.*, 36 Mass.App.Ct. 411, 632 N.E.2d 841, 846 (1994).

Asserting that Scully would have knowledge as to why Plaintiff did not undergo an independent medical examination in 1995 at Fidelity's request, Fidelity's counsel, Richard

Francis D. Dibble, Jr., Jerome M. Scully, Bulkley, Richardson & Gelinas, Springfield, MA, for Plaintiffs.

F. Faille ("Faille"), pursued the matter at deposition:

> Q. [Mr. Faille]: Let's get right to the meat of it. Why was it in 1995 that you refused to allow your client to have an independent medical examination in this case?
>
> Mr. Dibble: Objection. Instruct the witness not to answer that question in that form. It asks for the opinion of counsel, advice of counsel, and refers to advice from counsel to client.
>
> Mr. Faille: I am not asking for a communication. I am saying why did you tell United States Fidelity & Guaranty Company that you wouldn't allow your client to have an independent medical examination.
>
> Mr. Dibble: Objection. Instruct the witness not to answer that question in that form.
>
> Mr. Faille: On what basis?
>
> Mr. Dibble: Attorney/client privilege, work product.
>
> Mr. Faille: Let's go off the record.

(Def. Mot. to Compel (Docket No. 64) Exhibit A (Scully Dep.) at 5–6.) When the deposition resumed, Dibble objected to questions regarding Scully's valuation of the case. (Id. at 6–8.) Dibble instructed Scully not to answer any such questions to the extent it would reveal his thought processes or his communications with Plaintiff. Dibble added: "If there are facts of which you are aware of some particular event that occurred in that time frame, you can answer that question." (Id. at 10.)

The questioning continued without significant objection until the following interchange:

> Q. [Mr. Faille]: In formulating an evaluation of the case, can you tell me what factors you think are important in order to come up with a value on a case?
>
> Mr. Dibble: Objection. Instruct the witness not to answer that.
>
> Mr. Faille: That's it. We're going to court.
>
> Mr. Dibble: Well, I say I'm disappointed that you're not trying to ask—
>
> Mr. Faille: No.

> Mr. Dibble: —questions—
>
> Mr. Faille: No, you're being totally obstructionist.
>
> Mr. Dibble: Well, I disagree. I put on the record I'd be happy to go now if you'd like to.
>
> Mr. Faille: No. I'll file a motion.

Id. at 14—15. That motion is now before the Court. The motion appears limited to questions regarding the decision that Plaintiff not undergo an independent medical examination.

Fidelity argues that "[t]here appears to be something totally inequitable in this matter," since it had been required to turn over its entire claim file to Plaintiff. Those files include evaluations of the underlying case, the claim handler's notes and evaluations of settlement. In order to properly defend the case, Fidelity argues, it at least needs to know "at what times and why it was not permitted information to evaluate the case." In response, Plaintiff asserts that, even if the information sought by Fidelity were relevant to the subject matter of the action, it is protected by the attorney-client privilege and work-product doctrine.

■ The work-product doctrine provides a means to protect an attorney's materials made in preparation of trial. *See Hickman v. Taylor,* 329 U.S. 495, 67 S.Ct. 385, 91 L.Ed. 451 (1947). Although the doctrine is "intertwined" with the attorney-client privilege, *Harding v. Dana Transp., Inc.,* 914 F.Supp. 1084, 1089 (D.N.J.1996) (citing *United States v. Nobles,* 422 U.S. 225, 238 n. 11, 95 S.Ct. 2160, 2170 n. 11, 45 L.Ed.2d 141 (1975)), its purpose differs:

> [T]he attorney-client privilege exists to keep inviolate confidences of clients to their attorneys, thereby presumably enhancing the communication exchange. The work-product doctrine, however, seeks to enhance the quality of professionalism within the legal field by preventing attorneys from benefitting from the fruit of an adversary's labor.

*Id.* at 1096. *See also Hickman,* 329 U.S. at 511, 67 S.Ct. at 393–94 (describing fundamentals of work-product doctrine). As far as the

court can tell from the deposition excerpts, the work-product doctrine, while cited by Plaintiff, is not at issue; the instant matter does not concern the discovery of documents or tangible things. *See* Fed.R.Civ.P. 26(b)(3).

The attorney-client privilege, on the other hand, is at issue. The privilege "exists to protect not only the giving of professional advice to those who can act on it but also the giving of information to the lawyer to enable him to give sound and informed advice." *Upjohn Co. v. United States*, 449 U.S. 383, 390, 101 S.Ct. 677, 683, 66 L.Ed.2d 584 (1981). The shelter afforded by the privilege, however, "only protects disclosure of communication; it does not protect disclosure of the underlying facts by those who communicated with the attorney[.]" *Id.* at 395, 101 S.Ct. at 685. The scope of the attorney-client privilege is fact sensitive and must be addressed on a case-by-case basis. *Id.* at 396–97, 101 S.Ct. at 685–86.

The concept of reasonableness within M.G.L. ch. 176D § 3(9)(f) similarly requires a case-by-case evaluation of the relevant facts. In this regard, there is no question that information about Plaintiff's declination to undergo a medical examination is relevant to Plaintiff's claim, if only through the defense asserted by Fidelity. Risk analysis necessarily varies with the circumstances of each particular case and is refined as information about an injury becomes available. *See RLI Insurance Co. v. General Star Indemnity Co.*, 997 F.Supp. 140 (D.Mass.1998) (Keeton, J.). A medical examination, or the refusal to undergo one, could be a factor in that analysis.

Fidelity takes this concept of reasonableness a step further, citing the recent suggestion by the Massachusetts Appeals Court that, in similar cases, "courts be vigilant to ensure that plaintiffs not engage in 'reverse bad faith' conduct." *Parker v. D'Avolio*, 40 Mass.App.Ct. 394, 664 N.E.2d 858, 864, n. 9 (1996). Soon after that suggestion was made, a court in this district was presented with an insurance company's motion to amend its answer to add just such a counterclaim. *See Schulz v. Liberty Mutual Insur-*

*ance Co.*, 940 F.Supp. 27 (D.Mass.1996). Although the court denied the motion to amend, noting that the *Parker* court "made no pronouncement that it was recognizing a heretofore unknown cause of action," it did address what appears to be at issue here as well:

> From all that appears, the [Appeals] Court seems to be noting that when examining all the attendant circumstances, it is important that the defendants' conduct not be viewed in a vacuum, but rather that plaintiff's conduct also be considered.

*Id.* at 31. The court continued:

> [E]ven if the *Parker* case could be said to establish a new common law cause of action, it is not at all clear that the facts alleged by the defendant would fall within the contours of such a claim. The Appeals Court stated that the plaintiff must be forthcoming with information so that the defendant can realistically evaluate the case. There is no allegation in [defendant's] proposed counterclaim that the plaintiffs failed to provide the insurance company with pertinent facts and information. What the defendant does allege is that the plaintiffs' failure timely to make a demand, their refusal to negotiate "realistically", and their actions both in filing a complaint against an entity known to be in bankruptcy and, thereafter, seeking a default judgment against that entity, all constitute "reverse bad faith." These allegations are not related to any purported failure on the part of the plaintiffs that somehow hampered the ability of [defendant] to evaluate the merits of their claims. Again, while this alleged conduct by the plaintiffs may well be relevant in the context of the defendant's affirmative defense, it does not appear to be in the nature of the conduct described by the Appeals Court.

*Id.*

■ While the doctrine of "reverse bad faith" is not at issue in the case at bar, Plaintiff's refusal to undergo an independent medical examination is squarely within the ambit of relevancy to Fidelity's defense, particularly at this stage of discovery. It is clear from the discussion in *Schulz*, together

with a reasoned view of both chapters 176D and 93A, that in the instant case the court, at trial, will have to look at the totality of attendant circumstances in order to measure Plaintiff's claim against Fidelity. *Cf. Forcucci v. United States Fidelity & Guar. Co.,* 11 F.3d 1, 2 (1st Cir.1993) ("Negotiating a settlement, particularly when the damages are unliquidated, is, to an extent, a legitimate bargaining process.... The reasonableness of a defendant's response is to be considered in the light of the situation as a whole, one aspect of which was the size of plaintiffs' demand.")

Interestingly enough, the instant case, given the particular facts, actually borders on an implied or anticipatory waiver of Plaintiff's attorney-client privilege. A party is considered as having waived its privilege if "(1) assertion of the privilege was a result of some affirmative act, such as filing suit, by the asserting party; (2) through this affirmative act, the asserting party put the protected information at issue by making it relevant to the case; and (3) application of the privilege would have denied the opposing party access to information vital to his defense." *Hearn v. Rhay,* 68 F.R.D. 574, 581 (E.D.Wash.1975). Concededly, Plaintiff has not put at issue directly her refusal to undergo a medical examination. However, given the nature of her claim against Fidelity, Plaintiff could not but have expected that Fidelity would assert the very defense it now claims enables it to peek behind the curtain of her attorney-client privilege.

Granted, the instant case is not of the usual variety in which the privilege is impliedly waived. *Compare Bieter Co. v. Blomquist,* 156 F.R.D. 173, 179 (D.Minn.1994) ("[I]t would be unfair and highly prejudicial to permit third-party plaintiffs to sue [the lawyer] for malpractice, yet simultaneously conceal documents which have a direct bearing on [the lawyer's] alleged malpractice...."). However, the advice or conduct of a party's lawyer may become the subject of litigation—and thereby impliedly waived—when that lawyer's advice or conduct is explicitly or implicitly made the basis of an offense or defense. For example, "[c]ourts have found waiver by implication when a client testifies concerning portions of the attorney-client communication, ... when a client places the attorney-client relationship directly at issue [that is, in a malpractice suit]... and when a client asserts reliance on attorney's advice as an element of a claim or defense." *Sedco Int'l, S.A. v. Cory,* 683 F.2d 1201, 1206 (8th Cir.1982). Here, however, Fidelity evidently has not taken Plaintiff's deposition or otherwise asked her about her initial refusal to undergo a medical examination. As a result, the court has no record as to whether Plaintiff relied on the advice of counsel in this regard and thereby put that advice at issue. *See Pitney–Bowes, Inc. v. Mestre,* 86 F.R.D. 444 (S.D.Fla.1980).

Although it cannot say conclusively that there has been a waiver, the court does believe that the attorney-client privilege should be interpreted narrowly in this matter. *See Allendale Mut. Ins. Co. v. Bull Data Sys., Inc.,* 152 F.R.D. 132, 135 (N.D.Ill. 1993) ("As the attorney-client and work product privileges obscure the search for truth, they are both narrowly construed by courts to restrict their impact upon the discovery process."). Strictly constructed, the privilege applies "to a confidential communication from an attorney to a client, but only if that information is based on confidential information provided by the client." *Mead Data Cent., Inc. v. United States Dep't of the Air Force,* 566 F.2d 242, 254 (D.C.Cir.1977). "The purpose of the privilege is to insure that the client may confide in his attorney to obtain legal advice. Unless the legal advice reveals what the client has said, no legitimate interest of the client is impaired by disclosing the advice." *SCM Corp. v. Xerox Corp.,* 70 F.R.D. 508, 522–23 (D.Conn.1976). Moreover, the "structural framework" surrounding the substance of the communications is discoverable. *Condon v. Petacque,* 90 F.R.D. 53, 54 (N.D.Ill.1981). Accordingly, the fact of the attorney-client relationship and the dates on which services were performed are not necessarily privileged.

Given that the relevance of the information sought is readily apparent, what is the scope of protection afforded Plaintiff by the attorney-client privilege? Unfortunately, because Scully's deposition was cut short in the pres-

ent matter, the exact contours of his reliance on the attorney-client privilege are unclear. In addition, the questioning by Faille did nothing to solve the problem of determining the scope of the claimed privilege. Faille's first substantive question to Scully was an immediate foray into the impermissible domain of Plaintiff's counsel's thought processes. *See Hickman,* 329 U.S. at 510–511, 67 S.Ct. at 393–94 (mental impressions, conclusions, opinions, or legal theories of an attorney are to be specially protected). When Dibble suggested that the claim of privilege was limited to advice of counsel, but that facts and events could be inquired into, the questioning appears to have stopped without an exploration of the true limit of the privilege claimed. As a result, it is difficult to ascertain whether the information sought by Fidelity comes within the oft-quoted formulation of the attorney-client privilege set forth by District Judge Charles Wyzanski, Jr.:

> The privilege applies only if (1) the asserted holder of the privilege is or sought to become a client; (2) the person to whom the communication was made (a) is a member of the bar of a court or his subordinate and (b) in connection with this communication is acting as a lawyer; (3) the communication relates to a fact of which the attorney was informed (a) by his client (b) without the presence of strangers (c) for the purpose of securing primarily either (i) an opinion on law or (ii) legal services or (iii) assistance in some legal proceeding, and not (d) for the purpose of committing a crime or tort; and (4) the privilege has been (a) claimed and (b) not waived by the client.

*United States v. United Shoe Mach. Corp.,* 89 F.Supp. 357, 358–59 (D.Mass.1950).

Despite these shortcomings, it does appear that Plaintiff's counsel was on the road to seeking overly broad protections. If Plaintiff's asserted privilege aims to protect information relevant to her claim against Fidelity, some disclosure is appropriate, if not mandated. Plaintiff is reminded that it is her burden to demonstrate the applicability of the privilege. *Winchester Capital Management Co., Inc. v. Manufacturers Hanover*

*Trust Co.,* 144 F.R.D. 170, 174 (D.Mass.1992). *See also United States v. White,* 950 F.2d 426, 430 (7th Cir.1991) (party seeking to invoke the privilege, as the discovery opponent, has the burden of establishing all its elements). "In demonstrating that the privilege is applicable, [Plaintiff] bears the burden of proving that the communications were intended to be kept confidential." *Winchester Capital,* 144 F.R.D. at 174. The scope of the privilege "must be made and sustained on a question-by-question . . . basis." *United States v. Lawless,* 709 F.2d 485, 487 (7th Cir.1983) (citing 8 Wigmore, Evidence § 2291 (McNaugton Rev.1961)).

Accordingly, Fidelity can recall Scully for deposition and explore the matter more specifically. This recall does not make Scully a target for any and all questions which Fidelity may want to ask. The court merely points out that, in its view, all of Scully's actions may not be cloaked in privilege. Indeed, it appears that Plaintiff's attorneys, when submitting to the deposition, understood that certain inquiry was appropriate. Within such limits as the court has explained, Fidelity's motion is ALLOWED. The court suggests that the parties arrange a continuation of the deposition at a time when the court will be available to rule on any disputes which might arise.

IT IS SO ORDERED.