Brassard, J.
In 1998, the plaintiff, Crystal Broaddus (“Broaddus”) was injured in an automobile accident. She brought a tort action against the driver of the other car, David Silva ("Silva”) and recovered a verdict in the Superior Court after a jury trial in June 2001. In this action, the plaintiff has alleged that the insurer of the defendant in the original action, Mass West Insurance Company, Inc. (“Mass West”) did not effectively pursue settlement of the case after liability had become reasonably clear in violation of General Laws Chapter 176D and 93A. This case was heard, jury waived, from October 27 to November 2, 2004. The parties presented forty-four exhibits and five witnesses: Attorney Karl D’Angio (“Attorney D’Angio”), Mark Mullane (“Mullane”), Attorney Paul Gillespie (“Attorney Gillespie”), Arthur Kiriakos (“Kiriakos”), and Matthew S. Howard (“Howard”). Counsel for both parties conducted the trial in an exemplary matter.
After review of the exhibits and the credible trial testimony, I find the following facts — many of which are undisputed — based on the preponderance of the evidence.
In January 1998 Broaddus was involved in an automobile accident. After the accident, she received treatment and physical therapy for her injuries. In late 1998, she was diagnosed with a herniated L5-S1 disc. Further medical evaluation by her doctor concluded that the herniated disc was causally related to the accident. In late 1998, Broaddus received a series of epidural steroid injections administered by Dr. Jonathan Jacques (“Dr. Jacques”). Further MRIs and medical treatment during 1999 confirmed the presence of a herniated disc.
In March 1999 Broaddus brought a lawsuit against the driver of the other car in the accident, Silva. Mass West, Silva’s insurer, appointed the firm of Gillespie & Wysor (now Gillespie & Rose) to defend this lawsuit. Silva possessed a $ 1 million policy with Mass West and he admitted that Broaddus was not at fault for the accident. At the time of the filing of the suit, no demands for settlement were made.
In December 1999, Mass West claims adjuster Mullane assumed global responsibility for the case. In his initial assessment of the case, Mullane had concerns about causation with respect to Broaddus’ herniated disc; in particular, he retained doubts that the low-impact nature of the accident would cause such an injury. On December 7, 1999, Broaddus’ attorney, Attorney D’Angio, sent a demand letter to Mass West seeking a $500,000 settlement. This demand letter did not include any quantitative calculation of damages for diminished earning capacity or lost wages; the plaintiff did not at that time pursue these damages due to her employer’s liberal sick leave policy. No response was made to this demand. At trial, Attorney D’Angio testified that he knew that he could reduce his demand as settlement negotiations proceeded. After the deposition of Silva was conducted, Attorney D’Angio sent a second demand letter to Mass West on March 10, 2000. This demand also sought $500,000. In response, at a pre-trial conference in May 2000, Mass West suggested mediation. At the time, in light of the plaintiffs significant settlement demands, it was not unreasonable (albeit discourteous) that an insurer — especially one questioning causation of the injury and damages — would not respond to the plaintiffs first demand. Because Broaddus restated her initial demand in March 2000, a response seeking mediation as an alternative method of resolving the case was reasonable.
Mullane testified that, when he reviewed the file in May 2000, although liability (in terms of negligence) was one hundred percent attributable to the insured, he had concerns about causation and damages. However, prior to the end of2000, Mullane did not perform a comprehensive bodily injury evaluation and his investigation of the case was slow. Although Mullane’s actions were not commendable, they did not fall to the level of a Chapter 176D violation.
Several medical developments occurred in the days leading up to the mediation on July 20, 2000. On June 10, 2000, Dr. Allan Herskowitz (“Dr. Herskowitz”), *553 Broaddus’ doctor, directed Broaddus to have a new MRI. On June 23,2000, Dr. Herskowitz issued a report (Exhibit 8) concluding that the MRI revealed “arachnoiditis of the cauda equina.” However, in this report he noted that he was “uncertain as to the etiology of this.” On July 13, 2000, Attorney D’Angio served supplemental answers to interrogatories referring to this diagnosis and noted that Dr. Herskowitz had not made any conclusions with respect to causation.
On July 5, 2000, Dr. Avraham Almozlino (“Dr. Almozlino”), a neurologist retained by Silva’s counsel, concluded (based on a review of Broaddus’ available medical records) that Broaddus’ lower back pain was the result of facet joint hypertrophy and not due to disc herniation. Moreover, he concluded that her facet joint pain was the result of an underlying chronic degenerative condition and not a result of the accident. This opinion contrasted with an earlier review (from June 2000) of the medical reports by Dr. Hugh O’Flynn (“Dr. O’Flynn”) obtained by Silva’s counsel. In his report (Exhibit 41, Tab 17), he writes that Broaddus’ symptoms “are causally related to the motor vehicle accident dated January 30, 1998.” However, he noted that “I would hesitate to declare a permanent disability without a current IME.” Dr. O’Flynn concluded that if the back pain constituted a permanent disability, then Broaddus’ impairment could be considered a 5% disability. A report of Dr. Donald Pettit (“Dr. Pettit”), retained by Attorney D’Angio, dated July 18, 2000 (Exhibit 47, Tab 16) concluded that she “remains partially disabled due to her auto accident of January 1998.” However, this report noted that Broaddus had “not yet reached an end result.”
Therefore, as the mediation approached, Mass West was faced with several conflicting reports. The reports of Dr. Almozlino and Dr. O’Flynn both evaluated Broaddus’ medical records but arrived at different conclusions concerning the origin of Broaddus’ back pain. Moreover, even Dr. O’Flynn’s report expressed uncertainty with respect to the existence of any permanent disability. Dr. Pettit’s report noted that Broaddus had not reached a medical end result. Dr. Herskowitz’s report of June 23, 2000 opened a new, significant component to damage claims. These reports illustrate not just a dispute between Dr. Almozlino and the other doctors concerning the causal linkage between Broaddus’ injuries and the accident, but also uncertainty concerning the ultimate extent of damages.
At the mediation on July 20, 2000, Mass West offered Broaddus a $20,000 settlement. Attorney D’Angio did not respond to this offer. He testified that at this time he perceived the case as having a final value of $90,000 to $100,000 and, having become aware of the recent diagnosis of arachnoiditis (without a causal link), he had less room to negotiate a settlement downwards. The plaintiffs expert at this trial, Kiriakos, testified that at the time of the mediation, the case had a likely value of $40,000 to $60,000.[1] Given these conflicting estimates of the case’s likely value (and the recent introduction of arachnoiditis into potential damage calculations) an initial offer of $20,000 was appropriate.[2] The reasonableness of this offer is reinforced by viewing it through the prism of the jury’s verdict of $35,000. Although a judge deciding a c. 93A case is not bound by the findings of the jury in the underlying action, the verdict of the jury validates the reasonableness of the insurer’s position at the time of the mediation and its subsequent decision to present an initial offer of $20,000.
Dr. Almozlino reviewed the conclusions of Dr. Herskowitz. On November 15, 2000, he filed a report (Exhibit 41, Tab 14) in which he noted that the arachnoiditis “appeared after a series of epidural injections.” Along with affirming his earlier conclusion that Broaddus’ back pain was not the result of the accident, he opined that, “The arachnoiditis is not causally related to the 1/30/98 accident.. . My opinions as stated in the 7/5/00 report are unchanged.”
On December 27, 2000, the plaintiff sent a c. 93A demand letter to Mass West. In response, Mass West offered a $25,000 settlement. The plaintiff made no response to this offer.[3] Soon thereafter, Dr. Herskowitz submitted a final report, dated February 14, 2001 (Exhibit 41, Tab 11) to Attorney D’Angio in which he wrote that he had concluded that the plaintiff had suffered arachnoiditis as a result of the steroid injections administered due to her back pain in late 1998. As this report became available only one month before the originally scheduled trial date of March 19, 2001, the parties agreed to a joint motion to continue the trial to allow for a deposition of Dr. Herskowitz to be taken. This video deposition of Dr. Herskowitz was taken on March 30, 2001. Dr. Herskowitz was clear in his final report of February 14, 2001 and his video deposition of March 30, 2001 that the arachnoiditis originated in the epidural steroid injections that were made necessary as a result of treatment for Broaddus’ injuries resulting from the accident.
In this dispute, the critical time period began in April 2001, when Mass West considered its response to the medical conclusions of Dr. Herskowitz. Attorney Gillespie, in his letter of April 3, 2001 to Mullane (Exhibit 20), opined that Dr. Herskowitz’s testimony was “very weak” but would be sufficient to get the arachnoiditis issue to the jury. He also noted that he did “not find Dr. Herskowitz’s testimony to be as damaging as we anticipated.” Attorney Gillespie also pointed out that, although the injections were the immediate cause of Broaddus’ arachnoiditis, Mass West’s insured “may be liable for additional damage caused during the course of the patient’s treatment. The breaking of her chain of causation generally is not caused by the negligence of another practitioner even if there is medical malpractice ... It is our opinion . . . *554 that additional damage incurred during the course of treatment may be considered by the jury in assessing damages.” Following receipt of this letter, on April 10, 2001, Mass West held a “roundtable discussion” to consider this additional source of potential damages. In the wake of this discussion, Mass West increased its reserve to $150,000. This was the first and only time Mass West increased its original reserve of $15,000. Despite the fact that the reserve had been set at $150,000, when Mass West next communicated with Attorney DAngio, Mullane advised him that Mullane had settlement authority to offer only “a bit over” $100,000. Mass West did not present any new settlement offer to the plaintiff at this time.
From the time of the “roundtable discussion” in early April 2001 until trial in June 2001, Mass West continued to receive new reports concerning Broaddus’ condition. On May 18, 2001, the plaintiff presented Mass West with the report of Dr. Allan McCausland (“Dr. McCausland”) concerning Broaddus’ economic losses as a result of the accident (Exhibit 18). Although Dr. McCausland had been identified as a witness earlier in the litigation, this report expressly indicated Broaddus’ losses, specifically $369,465 to $656,827. On May 21, 2001, Attorney D’Angio served Mass West with supplemental answers to interrogatories identifying Dr. Marc Weiner (“Dr. Weiner”) who would and did testify at trial as to the existence of Broaddus’ arachnoiditis, its causal relationship to the accident, the plaintiffs prognosis and the possibility of permanent paralysis.
In a letter from Attorney Gillespie to Mullane dated May 21, 2001 (Exhibit 22), Attorney Gillespie wrote that he was seeking the examination of MRI films by Dr. Steven Defossez (“Dr. Defossez”), and “depending upon the interpretation of the MRIs, we should either consider settlement or accelerating efforts to receive a neurologic opinion regarding the causation and effects of the arachnoiditis on the plaintiff.” Attorney Gillespie contacted Dr. Defossez on June 4, 2001 to conduct this MRI review. Meanwhile, Attorney Gillespie also contacted Dr. Andrew Leader-Cramer (“Dr. Leader-Cramer”) to review the diagnosis of arachnoiditis. On June 15, 2001, Attorney Gillespie sent letters to Mullane indicating that Dr. Defossez had confirmed that MRIs taken in 1999 had demonstrated the existence of arachnoiditis (Exhibit 26) and that Dr. Leader-Cramer had concluded that the arachnoiditis was a result of epidural steroid injections, which in turn were necessitated by the accident (Exhibit 27). In this second letter, Attorney Gillespie concluded that the fact that the inj ections were the immediate cause of the arachnoiditis would not shield Silva from liability, as “the chain of causation leading from the accident to the present time, was unbroken by the possible intervening negligence of the doctors performing the epidural steroid block.”
On June 20, 2001, one week before the commencement of trial, Mass West presented an increased settlement offer of $60,000. Attorney D’Angio responded to this offer by reducing the plaintiffs demand to $450,000. On June 25, Mass West increased its offer to $90,000. The plaintiff did not respond to this offer. During trial, Attorney Gillespie communicated to Attorney D’Angio that he may have authority to settle for $120,000. In response to that informal offer, Attorney D’Angio suggested that Attorney Gillespie would have to get closer to $200,000. The parties could not bridge this gap. At trial, all evidence relevant to damages that the plaintiff offered was admitted. The plaintiff called, among other witnesses, Dr. Weiner, Dr. Herskowitz, and Dr. McCausland. The jury returned a verdict for Broaddus in the amount of $35,000. The PIP offset reduced this amount to $30,870.03. The final judgment, with interest, was $39,318.23.
Discussion
As noted earlier, I find that the settlement practices of Mass West from the time of the accident until April 2001 were reasonable. Mass West’s decision not to respond formally to the plaintiffs initial demand letter in December 1999 was reasonable in light of then-existing questions concerning the causal relationship between a low-impact accident and a herniated disc. Responding to the March 2000 demand with the suggestion of mediation was reasonable, considering the $500,000 demand that had been presented to Mass West by the plaintiff. Mass West’s $20,000 offer at mediation was appropriate. At that time, the very recent diagnosis of arachnoiditis — which had not been causally connected to the accident — was an element that could not be accounted for in a fair calculation of the value of the case. Moreover, as causation of the arachnoiditis had not been established until after Mass West’s response to the plaintiffs 93A demand letter, the $25,000 offer of settlement in response to that demand was reasonable.
The reasonableness of Mass West’s conduct from April 2001 until the time of trial in June 2001 is a closer question. It is helpful to refer to the standards presented in the statute, as interpreted by the appellate courts.
General Laws Chapter 176D, Section 3(9)(f) provides that it is an unfair insurance claims settlement practice to “[fail] to effectuate prompt, fair, and equitable settlements of claims in which liability has become reasonably clear.” Liability includes negligence, causation and damages. See Clegg v. Butler, 424 Mass. 413, 421 (1997). An objective testis used to determine whether liability was reasonably clear. “The fact finder determines ‘whether a reasonable person, with knowledge of the relevant facts and law, would probably have concluded, for good reason, that the insure[d] was liable to the plaintiff.’ ”[4] O’Leary-Alison v. Metropolitan Property & Cas. Ins. Co., 52 Mass.App.Ct. 214, 217 (2001), quoting Demeo v. State Farm Mut. Auto. Ins. Co., 38 Mass.App.Ct. 955, 956-957 (1995).
*555 In Bolden v. O’Connor Cafe of Worcester, Inc., 50 Mass.App.Ct. 56 (2000), the Appeals Court provided guidance for this objective test; moreover, the Bolden Court considered the impact of a jury verdict in the underlying case. In Bolden, the plaintiffs were awarded a twenty-million-dollar judgment against the defendant. After the judgment, the plaintiffs agreed not to execute the judgment against the defendant in exchange for the defendant assigning the plaintiffs any claims it may have against its insurer, the Liquor Liability Joint Underwriting Association of Massachusetts (LLJUA). Having acquired these rights, the plaintiffs alleged that the LLJUA had violated G.L.c. 176D, §3(9) (f) and c. 93A by failing to offer the limits of the defendant’s policy (one hundred thousand dollars) once liability had become reasonably clear. Id. at 57-59. In addition to defending itself in the c. 93A action, the LLJUA sought to intervene in the underlying action in order to pursue any potential appeals that the defendant may have waived due to the postjudgment settlement.
The Appeals Court recognized that these two outcomes may be related; “The LLJUA’s asserted interests in appealing — to overturn its insured’s liability and to reduce or eradicate the excess judgment — appear at first glance to loom quite large, particularly if one dwells on the possibility that the twenty-million-dollar juiy verdict against the insured Leitrim’s in the dram-shop case could be asserted as the measure of damages for doubling or trebling in the G.L.c. 93A case against the insurer LLJUA.” Id. at 65-66. However, even if damages may link the two cases, the Court concluded that determining liability in the c. 93A case does not rest on the insured’s liability; rather, “resolution of the G.L.c. 93A claim, including the issue of bad faith, will depend upon a factual determination of the LLJUA’s knowledge and intent." Id. at 66-67. Moreover, “notwithstanding what the . . . jury concluded about [the insured’s] liability, what matters in the G.L.c. 93A case is whether the [insurer] reasonably believed that [the insured’s] liability was not clear, or was unreasonable in holding that belief.” Id., at 67.
Applying this standard to the case at trial, it is the responsibility of the fact finder to determine the reasonableness of Mass West’s belief that causation and damages were not clear after it became aware of arachnoiditis. Mass West’s reliance on Dr. Almozlino to conclude that liability (including both causation and damages) was not clear was reasonable. Although Mass West increased its reserve in response to the February 14, 2001 opinion letter of Dr. Herskowitz and his March 30, 2001 deposition, I conclude that that was the action of an insurer reasonably recognizing that its exposure had become more serious. The insurer recognized that the plaintiff would get “over the bar” on her claim that the arachnoiditis was caused by the accident. The decision to raise its reserve does not warrant the conclusion that liability — with respect to the arachnoiditis — was reasonably clear. The reasonableness of Mass West’s belief that liability was not clear is underscored by the conclusion of the jury in the underlying action that Broaddus was only entitled to a recovery of $35,000.
Even assuming that Mass West was unreasonable in concluding that such liability was not clear in April 2001, its settlement practices until trial were merely slow; a delay of several weeks was not so unreasonable as to warrant c. 93A liability. “A determination of what constitutes unreasonable delay is ordinarily left to the factfinder.” Doe v. Liberty Mut. Ins. Co., 423 Mass. 366, 371 (1996). In Doe, a six-month delay, in the absence of bad faith or ulterior motives, was reasonable. In Hopkins v. Liberty Mut Ins. Co., 434 Mass, 556 (2001), a delay of two and one-half years from the time when liability was clear until an offer of settlement was unreasonable. The delay of several weeks occurred at the critical time frame of preparation for trial.
The settlement offer finally proposed, $60,000, and the ensuing negotiations (formal and informal) demonstrate appropriate settlement conduct by both parties. In the end, settlement negotiations ended when plaintiff refused to reduce her demand. Although the initial offer of $60,000 one week before trial (and eleven or twelve weeks after the deposition of Dr. Herskowitz to the effect that there was a causal connection between the accident and arachnoiditis) was slow, it was not so slow as to be non-prompt or unreasonable.
At the same time the alleged causal relationship of arachnoiditis to the accident was becoming apparent, Mass West was engaging in preparations for trial. Mass West sought other opinions in the interval between Dr. Herskowitz’s report and trial. Three doctors, Dr. Herskowitz, Dr. Weiner, and Dr. Leader-Cramer, had opined that the arachnoiditis was causally related to the accident, with only Dr. Almozlino maintaining an opposing conclusion. These reports clearly warranted Mass West’s reassessment of its potential exposure; nonetheless, a risk of a serious level of liability does not rise to the level of clear liability under G.L.c. 176D.
Therefore, as I find that liability (including causation and damages) in excess of the amounts variously offered was not “reasonably clear” at any time after the accident in January 1998, I find that Mass West did not violate the requirements of G.L.c. 176D and c. 93A. Judgment shall enter for the defendant.

The plaintiffs suggestion that the case had a value of $150,000 at this time is, therefore, not credible.

Likewise, these different estimates of the case’s value and the influence of arachnoiditis made a successful conclusion of the case at mediation impractical.

The plaintiffs decisions to respond to neither this $25,000 offer nor the earlier of $20,000 suggests that the plaintiff viewed these offers as too low to be worthy of a counteroffer. This approach to negotiation by the plaintiff was similar to that adopted by the defendant when it declined to respond formally to the plaintiffs two $500,000 demands in *556 early 2000. The defendant apparently perceived these demands as too high to be worthy of a counteroffer. In effect, both parties adopted a “no-move” negotiation strategy.

The Appeals Court has identified evidence that is relevant and evidence that is not: “Relevant evidence may include insurance industry practices in similar circumstances, expert testimony that the insurer violated sound claims practices, the defendant’s own evaluation of the plaintiffs claim, and advice given to the insurance company on the probability of success at trial.” O'Leary-Alison, 52 Mass.App.Ct. at 217 n.3, citing Bolden v. O'Connor Cafe of Worcester, Inc., 50 Mass. App.Ct. 56, 67 n.16 (2000). On the other hand, “the cost of defense, the size of the plaintiffs demand, and the insurer’s ‘business judgment’ are all unrelated to the likelihood of the defendant’s liability." Demeo, 38 Mass.App.Ct. at 956.